STATE of Wisconsin, Plaintiff-Respondent,

v.

Monica Maria MIGLIORINO, n/k/a Monica Marie Miller
Defendant-Appellant.

Court of Appeals

*No. 91–2440–CR. Submitted on briefs May 5, 1992.—Decided
August 18, 1992.*

(Also reported in 489 N.W.2d 678.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Ronald L. Wallenfang* of *Quarles & Brady* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *Jeffrey A. Kremers,* special prosecutor, of Milwaukee.

Before Sullivan, Fine and Myse, JJ.

FINE, J. Monica Marie Miller (nee Migliorino) appeals her conviction for violating section 943.145, Stats., trespass to a medical facility. We conclude that the trial court denied her compulsory-process-based right to due process, and, therefore, reverse.

## I.

This case arises out of Mrs. Miller's entry into a medical facility, and her alleged refusal to leave when asked to do so. The statute under which she was charged and convicted provides:

> Whoever intentionally enters a medical facility without the consent of some person lawfully upon the premises, under circumstances tending to create or provoke a breach of the peace, is guilty of a Class B misdemeanor.

Section 943.145(2), Stats.[1] In order to obtain a conviction under this provision, the State must, as the trial court appropriately instructed the jury, prove beyond a

---

[1] The statute was held to be constitutional in an earlier appeal in this case, *State v. Migliorino,* 150 Wis. 2d 513, 442 N.W.2d 36 (1989), *cert. denied,* 493 U.S. 1004.

reasonable doubt the following elements: (1) that the defendant intentionally entered a medical facility;[2] (2) that the intentional entry was without the consent of a person lawfully on the premises; (3) that the intentional entry was made "under circumstances tending to create or provoke a breach of the peace"; and (4) that the defendant knew that the entry was both without consent and that it was made "under circumstances tending to create or provoke a breach of peace."[3] The focus of Mrs. Miller's appeal is on the third element.

The incident that underlies Mrs. Miller's conviction occurred the morning of February 27, 1987, at Affiliated Medical Services, a medical facility that performed first- and second-trimester abortions. The clinic operated out of an eighth-floor suite in a Milwaukee office building. According to the facility's executive director, persons seeking entrance to the clinic would enter a lobby from the street through the building's front entrance, tell the security guard where they were going, sign in, take an elevator to the eighth floor, and walk the fifteen to

---

[2] The term "medical facility" is defined by the statute as "a hospital under s. 50.33(2) or a clinic or office that is used by a physician licensed under ch. 448 and that is subject to rules promulgated by the medical examining board for the clinic or office that are in effect on November 20, 1985." Section 943.145(1), Stats.

[3] The trial court instructed the jury in conformity with Wis J I—Criminal 1439. As comment 5 to Wis J I—Criminal 1439 indicates, the use of the word "intentionally" in section 943.145(2), Stats., requires that the State prove beyond a reasonable doubt that "the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Section 939.23(3), Stats. Additionally, "the actor must have knowledge of those facts which are necessary to make his or her conduct criminal and which are set forth after the word 'intentionally'." *Ibid.*

twenty feet to the facility's door. When first seen in the clinic that day by the medical facility's executive director, Mrs. Miller was, according to the executive director's testimony, seated in the facility's waiting room "with pamphlets in her hand, talking with a patient, or talking to — at a patient." Mrs. Miller was there with Edmund Bond Miller, whom she later married.[4] The executive director testified that she told them that they were trespassing, that they should leave, and that the police would be called if they did not leave. At this point, according to the executive director, Mrs. Miller "was sitting in the chair talking to people about how could they kill their baby, please don't kill their baby, she could help them." The executive director told the jury that Mrs. Miller responded to the request that she and Mr. Miller leave by saying that she assumed that the police had already been called, and did not leave but "continued to talk in the manner she was talking." According to the executive director, the police arrived after she had called them twice, and after she had repeatedly, without success, asked the Millers to leave. When asked by the prosecutor how Mrs. Miller's presence affected her that morning, the executive director replied: "It disrupted my plan of what I was going to do for the day because I had to spend time calling the police department and monitoring what these people were doing."

The only other witness to testify for the State was a police officer who arrived in response to the executive director's call. He testified that when he entered the clinic, the Millers were distributing anti-abortion literature, and were "basically talking to all the patients that

[4]Mr. Miller was also charged with violating section 943.145, Stats., but the charge was dismissed by the trial court after the State had rested.

582

were there, telling them they were killing their babies." On cross-examination, the officer admitted that the criminal complaint he signed as the "complaining witness" represented that when he arrived at the clinic the Millers were outside the facility with the private security officer employed by the office building in which the clinic was located, and that the criminal complaint did not aver that he, the police officer, had seen either Mr. or Mrs. Miller inside the clinic premises.

Mr. and Mrs. Miller were the only witnesses to testify for the defense. Mr. Miller testified that when they were inside the medical facility, his wife was "having a very quiet" discussion with one of the patients, showing her some literature, and "speaking personally and warmly to this woman" in a "half whisper" voice that was "[v]ery soft." He related the substance of the discussion as follows:

> [S]he discussed psychological sequelae to abortion as covered in one of these pamphlets. She discussed the development of the child within the mother's womb and also offering — offering help in referring to, again, materials on the pamphlet.

Mr. Miller testified that the building's security guard entered the medical facility's waiting room three or four minutes after they did, and that both he and his wife left the medical facility at the security guard's suggestion thirty seconds to a minute later. Mr. Miller told the jury that when he "understood that [the guard] wanted us to leave . . . we got up and left." According to Mr. Miller, the police officer who had testified as part of the State's case emerged from the building's elevator after the Millers were already outside the clinic.

583

Mrs. Miller also testified, and told the jury her version of what happened after she entered the medical facility:

> I saw a young girl sitting by herself and I sat down next to her, in the seat next to her. And I asked her questions relating to pregnancy . . . I offered her information about abortion, about the physical and psychological complication[s] to abortion and the brochure . . . had a list on the back of it of pregnancy help places in the City of Milwaukee where I encouraged her to go to seek assistance in difficult pregnancy.

Mrs. Miller testified that the building's security guard arrived some five to six minutes after she and Mr. Miller had entered the medical facility: "He stood at the door and said something to the effect it's time for you to leave now. Please come with me. And we did." She also testified that she and Mr. Miller had left the medical facility before the police arrived.

Prior to the trial, Mrs. Miller sought to discover the identity of patients who were witnesses to the incident. The State objected. Affidavits submitted by the facility's executive director and by a licensed practical nurse employed by the facility represented that the patients wanted to keep their identities confidential. The trial court issued the following order:

> 1. If the State of Wisconsin intends to rely on any testimony which purports to characterize the actions or reactions of any witnesses other than employees of Affiliated Medical Services clinic who were inside the premises where the defendants were arrested, then such witnesses are to be produced for an in camera deposition by counsel. At the conclusion of the deposition, the Court will determine if the witnesses have any exculpatory evidence to give on

behalf of the defendants. If they do, then the defendants' request for a compulsory process shall be granted. If not, it shall be denied. The parties are directed to attempt to work out the details of how and when the in camera deposition proceeding shall occur.

 2. In the event the State of Wisconsin does not intend to rely on any such evidence, it shall submit a statement to the Court.

Upon receipt of the statement referred to in paragraph two of the order, the trial court denied Mrs. Miller access to the patients.

## II.

 It is a central tenet of American jurisprudence that a defendant in a criminal case has the right to compulsory process. The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." Article I, section 7 of the Wisconsin Constitution contains an almost identical mandate: "In all criminal prosecutions the accused shall enjoy the right . . . to have compulsory process to compel the attendance of witnesses in his behalf."

 The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to

present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas,* 388 U.S. 14, 19 (1967) (applying the compulsory-process clause to the states *via* the Fourteenth Amendment). Indeed, the compulsory-process right "is an essential attribute of the adversary system itself." *Taylor v. Illinois,* 484 U.S. 400, 408 (1988). The concomitant issue of access to the identity of witnesses, as to whom the compulsory-process right would apply, is generally analyzed against the framework of "fundamental fairness" guaranteed by due process. *Pennsylvania v. Ritchie,* 480 U.S. 39, 56 (1987). It would be a bizarre rule indeed that gave defendants a compulsory-process right to call witnesses but which also withheld from them the ability to discover the identity of those witnesses.

Although the protections afforded by the compulsory-process right may bow before other fundamental but competing interests, *see United States v. Nixon,* 418 U.S. 683, 709–710 (1974); *State v. McConnohie,* 121 Wis. 2d 57, 71, 358 N.W.2d 256, 263 (1984) (defendant's right to compulsory process is trumped by potential witness' right against self-incrimination), this deference has been carefully circumscribed. Thus, in *Ritchie,* the Supreme Court upheld on due-process grounds the right of a criminal defendant charged with sexually abusing his thirteen-year-old daughter to an *in-camera* review of investigatory files concerning the incidents that were prepared by Pennsylvania's protective-service agency even though the files were cloaked by a statutorily-created privilege subject to carefully delineated exceptions. *Ritchie,* 480 U.S. at 43, 58–61.[5] Similarly, in *State v.*

---

[5]The Court declined to speculate whether the result would have been different had the Pennsylvania statute protected the

*S.H.,* 159 Wis. 2d 730, 737–738, 465 N.W.2d 238, 241 (Ct. App. 1990), we held that a defendant in a criminal case has the due-process right to a trial court's *in-camera* review of material protected by a privilege created by Rule 905.04(2), Stats.

■■

Absent a constitutional provision, statute, or evidentiary rule to the contrary, the law is entitled to every person's evidence. *Nixon,* 418 U.S. at 709–710; *State v. Gilbert,* 109 Wis. 2d 501, 505, 326 N.W.2d 744, 746 (1982); *State v. Wallis,* 149 Wis. 2d 534, 536–540, 439 N.W.2d 590, 591–593 (Ct. App. 1989). As former Chief Justice Warren E. Burger emphasized for a unanimous Supreme Court:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*Nixon,* 418 U.S. at 709.[6] Thus, "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Id.,* 418 U.S. at 710. Nevertheless, the State contends that disclosure of the identity of

---

files "from disclosure to *anyone,* including law-enforcement and judicial personnel." *Id.,* 480 U.S. at 57 n.14 (emphasis in original).

[6]Justice William H. Rehnquist did not participate.

587

those patients who were witnesses to the incident underlying Mrs. Miller's conviction would violate their "medical and privacy rights" and should be prevented. We disagree.

Testimonial privileges in Wisconsin may not be created by judicial decision:

> **Privileges recognized only as provided.** Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:
>
> **(1)** Refuse to be a witness; or
>
> **(2)** Refuse to disclose any matter; or
>
> **(3)** Refuse to produce any object or writing; or
>
> **(4)** Prevent another from being a witness or disclosing any matter or producing any object or writing.

Rule 905.01, Stats. *See also Davison v. St. Paul Fire & Marine Ins. Co.,* 75 Wis. 2d 190, 202–206, 248 N.W.2d 433, 440–442 (1977) (Common-law testimonial privileges do not survive the enactment of Rule 905.01, Stats., unless they are "inherent or implicit" in a constitutional, statutory, or rule provision, and the court may not adopt privileges on a case-by-case basis.). Although "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental or emotional condition," Rule 905.04(2), Stats., a patient's mere physical presence in a physician's office is not within the ambit of this privilege, *see Jenkins v. Metropolitan Life Ins. Co.,* 173 N.E.2d 122,

588

125 (Ohio 1961) (fact and date of consultation is not privileged); 8 WIGMORE ON EVIDENCE § 2384, at 846–847 (McNaughton rev. 1961).[7] Additionally, despite the fact that some women seeking an abortion might prefer to keep that fact non-public, there is no testimonial "privacy" privilege in Wisconsin that authorizes the withholding of relevant evidence in their possession, and the dissent cites no authority in support of its conclusion to the contrary. Dissent at 600. As noted, Rule 905.01, Stats., specifically prevents common-law expansion of the law of testimonial privilege in Wisconsin; evidentiary rules may not be altered "merely because litigants might prefer different rules in a particular class of cases," *United States v. Salerno,* 112 S. Ct. 2503, 2507 (1992).

Our conclusion that there is no "consultation" element to the physician-patient privilege unless divulging the fact of consultation would also disclose "confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment," Rule 905.04(2), Stats., or a testimonial "privacy privilege,"

---

[7]Even though our decision does not rest on this point, we note that patients entering the medical facility here did so by a public elevator and through a public lobby, and had to announce their intention to visit the facility and sign in. As Judge Jack B. Weinstein and Professor Margaret A. Berger point out in their treatise, privacy concerns similar to those expressed by the State here are generally accommodated by "separate entrances and exits so that a patient can leave without being seen." 2 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE, ¶ 504[05] at 504—26 (1991). The patients' expectation of privacy here was, accordingly, less than it would have been if they could come and go without being seen by members of the public with other business in the building.

does not, without more, resolve this appeal. It is paradigm that a party may only introduce *relevant* evidence, *see* Rule 904.02, Stats., and that the right to compulsory process does not attach unless the potential witnesses have information relevant to the dispute, *State ex rel. Green Bay Newspaper Co. v. Circuit Court,* 113 Wis. 2d 411, 420–422, 335 N.W.2d 367, 372–373 (1983). A trial court's decision on relevancy, like other evidentiary rulings, is a discretionary determination that will not be upset on appeal if it has "a reasonable basis" and was made "in accordance with accepted legal standards and in accordance with the facts of record.' " *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498, 501 (1983) (citation omitted). We thus must evaluate whether the trial court correctly concluded, in effect, that the State's concession rendered the patients' potential testimony irrelevant as a matter of law.

As we have seen, the trial court ruled that an *in-camera* hearing to determine whether the patients who were present in the medical facility on the morning of February 27, 1987, had evidence relevant to Mrs. Miller's defense would be appropriate unless the State did not intend to rely "on any testimony which purports to characterize the actions or reactions of any witnesses other than employees" of the medical facility.

In response to the trial court's ruling, the State submitted the following:

> The State of Wisconsin intends to prove its case at trial without arguing whether or not patients present at the medical facility at issue were agitated or upset as a result of the defendants' conduct. Additionally, the State agrees that it will not seek to elicit from its witnesses any reference to their observations of the actions or reactions of any such patients present at the medical facility.

It is the State's position that the defendants entered into the medical facility for purposes other than to seek medical treatment, that they refused to leave the facility when requested by employees of the clinic, and only left after the arrival of a security guard. It is further the State's position that this testimony coupled with the well-known actions of the defendants in demonstrating at other similarly situated medical facilities constitutes circumstances tending to cause or create a breach of the peace under Wisconsin Statutes Section 943.145.

This is particularly true given the defendants' status as public figures with regard to the current controversy regarding abortions. The defendants have intentionally transformed themselves into public figures, via their repeated presence in the public eye, continuous public espousing of their moral beliefs, multiple appearances in print and electronic media, and previous public violations of Section 943.145, Wis. Stats. By knowingly shedding their private status regarding this issue, the defendants insured that their entry for a non-medical purpose into the medical facility and their refusal to leave that facility when requested would occur under circumstances tending to cause a breach of the peace.

The State intends to prove the foregoing through the testimony of clinic employees who were aware of the defendants' prior similar activities and through these same employees' observations of the defendants coming into their medical clinic for non-medical purposes. Additionally, the State will seek to enter evidence of the defendants' actions at similar demonstrations to show their knowledge and intention with respect to the likeliness of their actions tending to cause or create a breach of the peace.

591

The trial court held that this "narrowly structured factual presentation" obviated the necessity for the *in-camera* hearing. We disagree.

The focus of the third element of section 943.145(2), Stats., is on the circumstances at the time of the entry; that is, whether the circumstances were such that the entry "tend[ed] to create or provoke a breach of the peace"—more than mere entry must be proved in order for the State to obtain a conviction under section 943.145(2). As the dissent recognizes, the Wisconsin Supreme Court has concluded that this phrase is "substantially similar" to the language in the disorderly conduct statute, section 947.01, Stats., which prohibits "violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance," *Migliorino,* 150 Wis. 2d at 530, 442 N.W.2d at 43, and accordingly, is subject to the same standards that apply to section 947.01. Dissent at 599. Thus, whether conduct "tend[s] to create or provoke a breach of the peace," sec. 943.145(2), requires a case-by-case analysis, just as " 'what would constitute disorderly conduct in one set of circumstances, might not under some other.' " *City of Oak Creek v. King,* 148 Wis. 2d 532, 542, 436 N.W.2d 285, 288 (1989) (quoting *State v. Maker,* 48 Wis. 2d 612, 616, 180 N.W.2d 707, 709 (1970)). In this regard, the teaching of *State v. Zwicker,* 41 Wis. 2d 497, 508, 164 N.W.2d 512, 517–518 (1969), *appeal dismissed,* 396 U.S. 26, is helpful:

> Wisconsin's disorderly conduct statute proscribes conduct in terms of results which can reasonably be expected therefrom, rather than attempting to enumerate the limitless number of antisocial acts which a person could engage in that would menace,

disrupt or destroy public order. The statute does not imply that all conduct which tends to annoy another is disorderly conduct. Only such conduct as unreasonably offends the sense of decency or propriety of the community is included. The statute does not punish a person for conduct which might possibly offend some hypercritical individual. The design of the disorderly conduct statute is to proscribe substantial intrusions which offend the normal sensibilities of average persons or which constitute significantly abusive or disturbing demeanor in the eyes of reasonable persons.

The trial court's ruling here must be evaluated in this light.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 904.01, Stats. The nature of the "circumstances" attending Mrs. Miller's entry into the medical facility is a "fact that is of consequence" within the meaning of Rule 904.01, and can only be ascertained by reference to the actions of those present at the time (the facility's employees and patients as well as Mr. and Mrs. Miller) as well as their recollections of the "circumstances" attending the event.[8] This evidence, however, is in conflict.

[8]The dissent's analysis would render the limitation in section 943.145(2), Stats., that the entry be made "under circumstances tending to create or provoke a breach of the peace" essentially meaningless in these cases; it would permit conviction for any unconsented entry so long as a theoretical "objective standard" of conduct is shown irrespective of whether the circumstances were *actually* such that the entry tended "to create or provoke a breach of the peace." This comes pretty close to advocating an impermis-

593

■According to the testimony by the medical facility's executive director, her morning was "disrupted" because she had "to spend time calling the police department and monitoring what these people were doing." She also testified that Mr. and Mrs. Miller refused to leave even though they were repeatedly asked to do so, and that they did not leave until the police arrived. The police officer's testimony was similar. The Millers, on the other hand, testified that they left almost immediately after the security guard requested, and that they were already outside the facility when the police arrived. They also testified that Mrs. Miller acted in a calm and compassionate manner. Independent testimony by any patients who were present at the time might have been helpful to a jury's resolution of these conflicts; if so, their testimony would be relevant. *See* Rule 904.01, Stats. Additionally, although not dispositive as to whether the circumstances were such that Mrs. Miller's entry "tend[ed] to create or provoke a breach of the peace," sec. 943.145, Stats., the patients' reactions to Mrs. Miller, if any, would also be evidence of those circumstances, and, therefore, relevant.[9]

sible directed verdict on one of the elements the State must prove. *Cf. State v. Kuntz*, 160 Wis. 2d 722, 736–738, 467 N.W.2d 531, 536–537 (1991) (in arson trial, instruction that mobile home was a "building" was an impermissible mandatory presumption, although harmless error in context of case).

[9]The dissent sets up a straw man when it asserts that "[u]nder the majority's analysis, we must look to the subjective reactions of the patients who were actually in the clinic at the time Miller engaged in the relevant conduct." Dissent at 599. Although, as we clearly state in the text that accompanies this note, the patients' reactions might bear on the "circumstances" attending Mrs. Miller's entry, and thus assist the jury in deter-

The trial court's ruling that the patients' potential testimony was not relevant in light of the State's limitation on the presentation of its case misapplied Rule 904.01, Stats., and prevented Mrs. Miller from having access to evidence that was potentially probative of her lack of guilt. As the Wisconsin Supreme Court reminds us, a "defendant has a constitutional right to discover the existence of potential witnesses. . . . includ[ing] the right to use compulsory process to obtain information which will lead to competent, relevant, material and exculpatory evidence." *Green Bay Newspaper Co.,* 113 Wis. 2d at 427–428, 335 N.W.2d at 376. Mrs. Miller's showing that there were patients in the medical facility when she was there entitles her, at the very least, to a judicial determination as to whether they in fact have knowledge about the circumstances attending her entry into and her presence at the facility. *See S.H.,* 159 Wis. 2d at 738, 465 N.W.2d at 241.

The judgment of conviction is reversed, and the cause is remanded for a new trial. On remand, the trial court should hold an *in-camera* hearing to determine whether any patients in the medical facility on the morning of February 27, 1987, have personal knowledge concerning the "circumstances" attending Mrs. Miller's entry into the facility that day, as well as the duration and nature of Mrs. Miller's presence. *See* Rule 906.02, Stats. (witness must have personal knowledge). The trial

---

mining whether the State has proved beyond a reasonable doubt that the entry was "under circumstances tending to create or provoke a breach of the peace," which is a prerequisite to conviction under section 943.145(2), Stats., the patients are transaction witnesses. Thus, their testimony might *also* be relevant to the attending "circumstances" *irrespective* of their own subjective reactions to Mrs. Miller's entry into the facility.

court, of course, is empowered to exclude relevant evidence whose probative value is "substantially outweighed" by "the danger of unfair prejudice" to a party, Rule 904.03, Stats.,[10] and to "protect witnesses from harassment or undue embarrassment," Rule 906.11(1), Stats.[11]

*By the Court.*—Judgment reversed, and cause remanded with instructions.

MYSE, J. (*dissenting*). I disagree with both the majority's analysis and conclusion and therefore dissent. The majority bases its conclusion upon Miller's right to

---

[10]The only parties here are, of course, the State of Wisconsin and Mrs. Miller.

[11]The dissent "suspect[s] that Miller is not interested in obtaining material and relevant evidence, but rather in chilling the state's prosecution of her unlawful conduct by forcing the public disclosure of the names of people seeking the services of this clinic." Dissent at 601. There is no support in the record for the dissent's "suspicion," and we are, of course, bound by the record. *In the Matter of Guardianship of Eberhardy,* 102 Wis. 2d 539, 571, 307 N.W.2d 881, 895 (1981). Defendants have a due-process right—a fundamental-fairness right—to call witnesses with evidence relevant to their defense, even if that is inconvenient or unpleasant for a witness, and even if it might tend to chill a prosecution. *Cf.* Rule 905.10, Stats. (Privilege to refuse identity of informer must give way when informer has knowledge "necessary to a fair determination" of the case.); *Roviaro v. United States,* 353 U.S. 53, 60–61 (1957) ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."). The alternative to such a rule, as the Framers well knew, is the Star Chamber, *see Gannett Co. v. DePasquale,* 443 U.S. 368, 387–388 n.18 (1979), where "suspicion" often carried the day.

compulsory process. The sixth amendment to the United States Constitution guarantees the accused a right to compulsory process—the right to subpoena witnesses on the accused's behalf. It is a mechanism used to compel the testimony of a person whose identity is known. This right is distinguished from the accused's right to discovery.

Miller's appeal does not implicate her right to compulsory process, but rather her right to discover the identity of witnesses she alleges are transaction witnesses possessing evidence that is material and relevant to her defense. Seeking to identify the names of these witnesses has always been analyzed under the due process right of the constitution and not the right to compulsory process. *Pennsylvania v. Ritchie,* 480 U.S. 54, 56 (1987). Accordingly, Miller's right to discover the identity of these witnesses should be analyzed as part of her due process right to a fair trial.

While there is no general constitutional right to discovery in a criminal case, *Weatherford v. Bursey,* 429 U.S. 545, 549 (1977), the due process provision of the fourteenth amendment entitles a defendant to discover the identity of transaction witnesses if the defendant can make a showing that the witnesses possess evidence that is relevant and material to the issue of guilt. *United States v. Valenzuela-Bernal,* 458 U.S. 866, 867 (1982). Because the state has acknowledged that it did not know the names of the patients who were in the clinic at the time of the offense, I will not address whether Miller had made sufficient demand for discovery upon the state. I do note, however, that demand for discovery must first be made and refused before any due process rights are implicated. *See Ritchie,* 480 U.S. at 59.

The majority concedes that the evidence adequately demonstrates each of the elements of the offense charged

597

except whether Miller's conduct tended to create or provoke a breach of the peace. Majority opinion at 580–81. However, there unquestionably is a conflict between Miller's testimony and the testimony of the clinic director and the arresting officer regarding Miller's conduct while in the clinic. The issue, therefore, is whether these patients could have offered any evidence relevant and material to the issue of whether Miller's conduct tended to create or provoke a breach of the peace within the meaning of sec. 943.145(2), Stats.

In its analysis of this issue, the majority erroneously focuses on whether Miller's confrontation with clinic patients disturbed the *patients,* rather than the operation/administration of the clinic itself or the clinic staff. The majority also erroneously assumes that the patients' reactions to Miller's literature and "counseling" efforts are relevant to the question whether Miller's conduct tended to create or provoke a breach of the peace.

The actual disruption of the clinic's operation/administration is uncontroverted by Miller's testimony. Furthermore, Miller's testimony proves that her conduct was disruptive. Miller acknowledged that she was delivering antiabortion literature containing graphic depictions of aborted fetuses and dead babies to patients of a clinic offering abortion services. She also testified that she knew she did not have permission to be on the clinic's private property and that the clinic director would call the police to have her removed from the premises. Miller's admissions that she was on the abortion clinic's private property without permission while delivering graphic antiabortion literature to clinic patients in an attempt to persuade them not to seek abortion services offered by the clinic illustrates that Miller's conduct disrupted the clinic's operation/administration. This disruption is sufficient evidence for conviction

under sec. 943.145(2), Stats. *See State v. Elson,* 60 Wis. 2d 54, 66, 208 N.W.2d 363, 370 (1973).

The majority notes that the patients may be able to corroborate Miller's contention that she remained in the clinic for only six minutes and not twelve to twenty minutes as the clinic director testified. Additionally, the patients may be able to corroborate Miller's contention that she left without the director twice having to demand that she leave the clinic. I respectfully suggest that neither of these facts is relevant or material to the offense charged. Whether Miller was there for twenty minutes or six minutes, and whether she was asked to leave or simply knew she should not be in the clinic conducting these activities is irrelevant to Miller's guilt or innocence. Even if the patients corroborated Miller's version of the events that occurred, it would not provide a defense to the offense charged.

Under the majority's analysis, we must look to the subjective reactions of the patients who were actually in the clinic at the time Miller engaged in the relevant conduct. Even if we were required to examine Miller's conduct in terms of its effect on the clinic patients, the subjective reaction of any particular patient is irrelevant. The language in sec. 943.145(2), Stats., is substantially similar to the language of the disorderly conduct statute, and therefore it should be subject to the standards set out in *City of Oak Creek v. King,* 148 Wis. 2d 532, 545, 436 N.W.2d 285, 290 (1989). Our supreme court held in *Oak Creek* that an actual disturbance is not necessary for conviction under sec. 947.01, Stats. *Oak Creek,* 148 Wis. 2d at 545, 436 N.W.2d at 290. "The law only requires that the conduct be of a type which *tends* to cause or provoke a disturbance, under the circumstances as they then existed." *Id.* (emphasis added). Thus, the conduct should be examined under an objective stan-

dard; that is, whether the conduct was of a type that would tend to disturb a reasonable person who was in the clinic at the time. Viewed objectively, there can be little doubt that distributing graphic pictures of aborted fetuses to pregnant women either contemplating or seeking abortion services is disruptive conduct.

Because the state does not contend that the clinic *patients* were disturbed, an analysis using this objective standard is unnecessary. The patients' subjective reactions are not relevant to the question whether Miller's conduct tended to create or provoke a breach of the peace relating to the clinic's operation; therefore, the evidence sought fails to meet the materiality and relevancy requirements of *Valenzuela-Bernal,* 458 U.S. at 867.

I further note that the majority has suggested that the clinic patients are entitled to no "testimonial privacy" under Wisconsin law. I disagree. The peculiar facts of *Jenkins v. Metropolitan Life Ins. Co.,* 173 N.E.2d 122 (Ohio 1961), cited by the majority, make its application to the present case questionable. Even if this case is applicable, it is unnecessary to address the majority's contention that a patient's mere physical presence in the physician's office is not within the medical privilege. We are not dealing with a patient's presence in a physician's office; we are dealing with the presence of a patient seeking specific medical services/treatment in a clinic providing only those specific services at that time. Patients seeking an abortion are entitled to confidentiality of their identities as part of their medical records by virtue of sec. 905.04(2), Stats. The majority relies on the following language: "The mere *fact of making a communication,* as well as the *date* of a consultation and the *number of consultations,* are . . . not privileged from disclosure, so long as the subject communicated is not

stated." 8 WIGMORE ON EVIDENCE § 2384 at 846 (McNaughton rev. 1961) (emphasis in original). Here, the very presence of patients in the abortion clinic identifies "the subject communicated." While it is possible that the right of confidentiality granted medical records may have to give way to properly implicated due process considerations, Miller has not demonstrated that her due process rights have been implicated. Therefore, there is no need to weigh Miller's due process rights against the patients' right of confidentiality.

I suspect that Miller is not interested in obtaining material and relevant evidence, but rather in chilling the state's prosecution of her unlawful conduct by forcing the public disclosure of the names of people seeking the services of this clinic. Such disclosure would have a chilling effect on the exercise of the right to obtain medical reproductive treatment. Because I conclude that Miller has failed to demonstrate that the patients possess any evidence relevant or material to her defense, she has not established a due process right to an *in camera* investigation as required by the majority. Miller simply has not discharged her burden of demonstrating that these patients possess evidence relevant to her guilt or innocence.

By concluding that Miller has failed to adequately demonstrate the need for the evidence possessed by the patients, I do not wish to create the impression that Miller's right to express her firm belief in the rightness of her cause is in any way diminished. The first amendment of our constitution guarantees that Miller may publicly demonstrate, protest and persuade others as to the rightfulness of her viewpoint. Nothing must ever infringe upon these rights, provided they are exercised on public property.

By the same token, the patients and clinic operators are entitled to be free from receiving unwanted messages on private property. Our constitutional free-speech protections do not extend to protect speech activities on the premises of a private medical clinic. *State v. Horn,* 139 Wis. 2d 473, 475–76, 407 N.W.2d 854, 855 (1987). Miller's right to free speech ends when that speech is delivered on the private property of one who does not desire to hear the defendant's message. *Rowan v. United States Post Office,* 397 U.S. 735, 737 (1970). We must with equal vigor protect the right of those who do not wish to be confronted in the sanctity of their private property with a message that is both offensive and disruptive. *Id.*

Because I conclude that Miller has not demonstrated a need for the evidence possessed by the patients, and in consideration of the patients' physician-patient privilege, I would affirm the trial court.