289 Wis.2d 422 (2006)
2006 WI App 27
711 N.W.2d 271
Philip T. SLIWINSKI, Plaintiff-Appellant,
v.
The BOARD OF FIRE AND POLICE COMMISSIONERS of the CITY OF MILWAUKEE, Defendant-Respondent.
No. 2005AP104.
Court of Appeals of Wisconsin.
Submitted on briefs December 27, 2005.
Decided January 24, 2006.
On behalf of the plaintiff-appellant, the cause was submitted on the briefs of Jonathan Cermele of Eggert & Cermele, S.C., of Milwaukee.
On behalf of the defendant-respondent, the cause was submitted on the brief of Grant F. Langley, city attorney, and Bruce D. Schrimpf, assistant city attorney, of Milwaukee.
*425 Before Wedemeyer, P.J., Fine and Kessler, JJ.
*424 ¶ 1. FINE, J.
Philip T. Sliwinski appeals the trial court's order affirming on certiorari-review a decision of the Board of Fire and Police Commissioners of the City of Milwaukee upholding Sliwinski's discharge from his job as a City of Milwaukee police detective. Sliwinski contends that the Board denied him his rights of confrontation and access to potential witnesses who might corroborate his assertions of innocence. We agree and, accordingly, reverse and remand to the Board for further proceedings.

I.
¶ 2. This case started as a sting operation on August 31, 2000, to see if information given to the Milwaukee Police Department that Edwin Bonilla, then a Milwaukee police detective, had been stealing drug money. The operation was conducted by agents of the Federal Bureau of Investigation at the request of and in coordination with the Department. Two adjoining rooms were rented at a Milwaukee hotel, and the FBI set up in both of the rooms closed-circuit video surveillance. The FBI agent in charge of the operation, John Steven Klugiewicz, testified that they did not use "live audio" during the surveillance. Twenty-three thousand dollars was placed in one of the rooms. The money was packaged to look like drug money  rubber-banded rolls in a paper bag.
¶ 3. After the stage was set, Bonilla was told to go to the hotel to investigate possible drug dealing. He did, and asked three other Milwaukee detectives to go with him: Sliwinski, Frank A. Velasquez, and Dale Jackson. When they arrived at the hotel, Bonilla and Velasquez went to the rooms, which apparently were not then *426 occupied. They were let in by someone whom they believed was a hotel housekeeper.[1] Sliwinski and Jackson stayed in the car.
¶ 4. The detectives searched the rooms, and Bonilla found the money.[2] Sliwinski testified that he was in the rooms when Bonilla found the money, having left *427 Jackson in the car. Bonilla told the Board that the three  Bonilla, Sliwinski, and Velasquezdiscussed taking some of the money:
once we found the money, a conversation initiated and about [sic] taking some of this money. And actually I do remember vividly that Phil Sliwinski stated that maybe we should take it all. I did not  we got into a further conversation with [Velasquez], myself and [Sliwinski], and we came up with this plan to take a thousand each.
Sliwinski and Velasquez also testified. They each denied either taking any of the money or talking with the others about taking any money.
¶ 5. As summarized by the Board in its decision upholding Sliwinski's dismissal from the force, the three detectives (Bonilla, Sliwinski, and Velasquez) then "went into the bathroom area (which was not covered by the cameras) for a few minutes after which they returned to the room." (Parenthetical and underscoring in original.) After the three came back into the *428 cameras' view, again as summarized by the Board, "Sliwinski and Velasquez are then shown on the videotape counting bundles of money and placing them back in the bag." Velasquez testified that they had gone into what he called "the vanity area" in one of the rooms "because it was a little bit better lighted." According to Velasquez, they dumped the money out and counted it so they could tell a supervisor how much was there.
¶ 6. Ultimately, the detectives returned to the Police Administration Building. Bonilla rode with a lieutenant to whom he gave the bag of money. The lieutenant was not aware of the sting operation, and testified at the hearing that "[i]t was routine that when large amounts of cash were seized a supervisor would be called to the scene." Sliwinski, Velasquez, and Jackson went back in a separate car, after first stopping to get some pizzas. Although there were some twelve FBI agents at the hotel in connection with the sting operation, none followed Bonilla and the lieutenant, even though Bonilla was the suspect and the lieutenant had the money. Yet, at least some of the FBI agents followed Sliwinski and the other two detectives.
¶ 7. After several hours, Bonilla, the lieutenant, Velasquez, and Jackson were ordered into a captain's office where they were told that there were, as phrased by the lieutenant in his testimony, "allegations of some wrongdoing." Jackson was escorted back to his desk, where he surrendered his badge, gun, and handcuffs. Sliwinski could see this. According to the evidence as found by the Board, Sliwinski then walked away from his desk toward the locker-room area where $1,000 of the money would later be found in an air vent. No fingerprints were found on the vent.
¶ 8. During his interrogation by the FBI away from the Police Administration Building, Bonilla admitted *429 to taking some of the money and implicated Sliwinski and Velasquez. Bonilla's case was plea bargained by the United States Attorney, and Bonilla pled guilty to taking some of the sting money. He testified that he was incarcerated for six months.
¶ 9. As a result of the sting, the then chief of police dismissed Sliwinski from the police department for violating a Department rule requiring all officers to "observe the laws." As noted, the Board upheld the dismissal.
¶ 10. Although Sliwinski does not contend that the evidence before the Board was not sufficient to affirm the Board's decision, he argues that the Board denied him rights of confrontation and of access to witnesses who might possibly support his contention that he never either discussed taking any of the bait money or took it. He claims the deprivation happened when his lawyer was cross-examining Klugiewicz about why the set-up did not include audio, as well as video, surveillance:
Q Okay. Why is there no audio tape to this?
A Privacy concerns and an interpretation of the Title 3 regulations seem to preclude that.
Q Who made that decision?
A Prosecutor.
Q Privacy concerns? Whose privacy concerns?
A Title 3 concerns.
Q Whose privacy concerns?
[Lawyer representing the Department]: Well, I'll object 

*430 [Lawyer representing Sliwinski]:
Q Detective Sliwinski's concerns? Detective Bonilla's?
[The Board's hearing examiner]: I'm going to overrule the objection. I think he can answer. Whose privacy rights are we talking about?
A The people in the room.
[Lawyer representing Sliwinski]:
Q Detective Sliwinski, Detective Bonilla and Detective Velasquez?
[Lawyer representing the Department]: I'll object again to that question. He's not qualified to answer. He's indicated that the prosecutor made the decision, not him.
[The Board's hearing examiner]: If he doesn't know, he can say he doesn't know.
A The question is?
[Lawyer representing Sliwinski]:
Q Whose privacy concerns? These guys?
A That decision was made by the prosecutor.
Q All right. So you don't know, right?
A I don't know.
Q Okay. Mr. Bonilla has alleged that there were certain statements made by Detective Velasquez and Detective Sliwinski which implied that they wanted to take money, right?
A That's correct.
Q Okay. Had we had some audio tape, we would be able to prove or disprove those statements; right?

*431 A If the microphones were placed by where they were talking, that's correct.
. . . .
Q Were there occupants of this room?
A Yes.
Q Who were they?
A That's beyond my scope to testify today.
Q Do you not know?
At this point, an assistant United States attorney interjected: "He answered your question, he can't answer that question." When Sliwinski's lawyer, apparently surprised by the interruption, asked, "Who is this?" the assistant United States attorney identified herself by name and declared:
I represent John Klugiewicz for the purposes of this hearing. He is authorized under the CFR to only provide testimony related to the facts and circumstances pertaining to [the Lawyer representing the Department]'s request for his authorization to testify today. If he says he cannot go beyond the scope of his authorization, he is precluded by federal law from doing so.
Sliwinski's lawyer objected to truncating his ability to cross-examine Klugiewicz: "Well, you know, had I known that he could only answer things that [the lawyer representing the Department] wanted him to answer, then I would have objected to listening to this guy's statement at all."[3]
*432 ¶ 11. The Board's hearing examiner replied: "I don't think that that's what we've said. He will respond to his questions. We may receive objections. We'll deal with those objections. But you can continue to ask questions as you deem appropriate and relevant to the investigation that we're here to deal with today." Sliwinski's lawyer's cross-examination of Klugiewicz then continued:
Q Who were the occupants of the room?
[Lawyer representing the Department]: Objection, relevance.
[The Board's hearing examiner]: I don't know that it's entirely relevant.
[Lawyer representing Sliwinski]: It's relevant because he said he had privacy concerns or the prosecutor had privacy concerns.
Q Who were the 
[The Board's hearing examiner]: The bottom line here is you're saying he could have but he didn't video  or audio tape these individuals, correct?
[Lawyer representing Sliwinski]: That is correct.
[The Board's hearing examiner]: You can ask him about procedures. I don't think it's important whose privacy concerns we're dealing with. I think what they did or didn't do is an important inquiry and you can go into that. But I don't think the identity of the individuals whose privacy concerns may or may not have been addressed is relevant to the issues that we have before us today.
*433 Sliwinski testified that, contrary to everyone's assumption about the lack of audio surveillance in the hotel rooms, he was told by the FBI during their interrogation of him that they did have an audiotape of what was said in the hotel rooms:
During this interrogation, they had stopped me and they alerted me, they said do you know we have audio tapes of what happened, what we discussed in that room.
Q [By Sliwinski's lawyer]: Audio tapes?
A Audiotapes. So before you go on any further, I want to make you aware that  this is what they told me, that we have audio tapes and we know what was discussed in there. And we also have a videotape of what occurred in that room. Then they continued with the interrogation. And when they asked me about the audio tape, I told the FBI, I said play it, play it right here and I'll tell you what was said in that room and we can clear this up right now. And they refused to. They said that they had to take it down to FBI headquarters to be examined because there is some mumblings [sic] on it or something.
Additionally, Harold T. Hampton, a sergeant with the Milwaukee Police Department, interviewed Sliwinski in this matter on November 8, 2000, more than two months after the sting operation, and told him that: "A surveillance was conducted. There were certain observations made and statements heard during that surveillance of your particular actions." Later in the interview, Hampton asked Sliwinski the following questions:
Q Were you made aware that there was a surveillance of the rooms in question . . .
A Yes, I was.
Q . . . Rooms 206 and 208?

*434 A Yes.
Q O.K. Now are you aware that there was an audio tape and a video tape placed in those rooms?
A The FBI told [unintelligible  could be "us" or "me"] that.

II.
¶ 12. Our review on certiorari of a decision by the Board is limited to whether the Board "(1) acted within its jurisdiction; (2) proceeded on a correct theory of law; (3) was arbitrary, oppressive, or unreasonable; or (4) might have reasonably made the order or finding that it made based on the evidence." State ex rel. Smits v. City of De Pere, 104 Wis. 2d 26, 31, 310 N.W.2d 607, 609 (1981); see also Gentilli v. Board of Police & Fire Comm'rs of Madison, 2004 WI 60, ¶ 39, 272 Wis. 2d 1, 19, 680 N.W.2d 335, 344 (scope of certiorari-review survives amendments to statutory-review procedure). Where, as here, an officer has also sought review under WIS. STAT. § 62.50(11)-(17), (20)-(22), certiorari review is limited to whether the Board kept within its jurisdiction or applied correct legal theories, because a circuit court's decision on a review sought under those subsections upholding a Board's action "shall be final and conclusive in all cases." Sec. 62.50(22); see Umhoefer v. Police & Fire Comm'n of Mequon, 2002 WI App 217, ¶ 12, 257 Wis. 2d 539, 547, 652 N.W.2d 412, 415-416 (applying WIS. STAT. § 62.13(5)(i), applicable to cities not of the "1st class"). Our review is de novo. Umhoefer, 2002 WI App 217, ¶ 12, 257 Wis. 2d at 547, 652 N.W.2d at 416.
¶ 13. Whether a Board of Fire and Police Commissioners has correctly applied the law in a review of *435 disciplinary action against an officer encompasses "common law concepts of due process and fair play." Id., 2002 WI App 217, ¶ 19, 257 Wis. 2d at 551, 652 N.W.2d at 417. This means that Sliwinski "was entitled to the full panoply of due process protections, the minimum requirements of which include the opportunity to confront and cross-examine adverse witnesses." See ibid. The due-process right to confrontation, which Umhoefer recognizes applies to hearings held to determine whether discipline imposed on police or fire officers is justified, see ibid., also means that those subject to discipline by their departments have rights of access to witnesses with potentially exculpatory evidence:
Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. Indeed, the compulsory-process right "is an essential attribute of the adversary system itself." The concomitant issue of access to the identity of witnesses, as to whom the compulsory-process right would apply, is generally analyzed against the framework of "fundamental fairness" guaranteed by due process. It would be a bizarre rule indeed that gave defendants a compulsory-process right to call witnesses but which also withheld from them the ability to discover the identity of those witnesses.
State v. Migliorino, 170 Wis. 2d 576, 585-586, 489 N.W.2d 678, 681-682 (Ct. App. 1992) (criminal case) (quoted source and citations omitted); see also United States v. Cook, 608 F.2d 1175, 1180-1181 (9th Cir. 1979) (access to witnesses), overruled on other grounds by Luce v. United States, 469 U.S. 38, 40 n.3 (1984). In Migliorino, we noted that the United States Supreme Court has recognized that, subject to narrowly drawn *436 and carefully circumscribed exceptions, "the law is entitled to every person's evidence." Id., 170 Wis. 2d at 587, 489 N.W.2d at 682 (referencing United States v. Nixon, 418 U.S. 683, 709-710 (1974)). Thus, WIS. STAT. RULE 905.01 declares:
Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:
(1) Refuse to be a witness; or
(2) Refuse to disclose any matter; or
(3) Refuse to produce any object or writing; or
(4) Prevent another from being a witness or disclosing any matter or producing any object or writing.
"[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." Nixon, 418 U.S. at 710. In Migliorino, we held that a person accused of trespass to a medical facility was entitled to know those who were in the area into which she allegedly trespassed, despite claims by the State that identification of the patients in the facility "who were witnesses to the incident underlying [the defendant's] conviction would violate their `medical and privacy rights' and should be prevented." Id., 170 Wis. 2d at 588, 489 N.W.2d at 682.
¶ 14. As we have seen, although both Klugiewicz and the assistant United States attorney representing him at Sliwinski's hearing before the Board referenced "Title 3 concerns" and the "CFR," we have not been provided with anything that indicates that anything in *437 those amorphous references falls within the narrowly drawn and carefully circumscribed exceptions to the fundamental principle of our jurisprudence that the law is entitled to every person's evidence. Indeed, the Board's hearing examiner seemed to recognize this because he ultimately sustained on relevancy grounds the objection of the Department's lawyer to the disclosure of who might have been present when the Department contends Sliwinski conspired with Bonilla and Velasquez to take some of the bait money. As we have seen, the hearing examiner ruled: "I don't think the identity of the individuals whose privacy concerns may or may not have been addressed is relevant to the issues that we have before us today." We disagree.
¶ 15. Admission of evidence is vested in the presiding officer's reasoned discretion, and a decision to admit or exclude evidence will not be reversed if, among other things, the officer "applied a proper standard of law." See State v. Sullivan, 216 Wis. 2d 768, 780, 576 N.W.2d 30, 36 (1998). The "identity" of those who might have been present at the sting scene and therefore able to affirm or negate the Department's circumstantial evidence supporting Bonilla's testimony that Sliwinski conspired with Bonilla and Velasquez to take some of the bait money is not only highly "relevant" because it goes to the heart of the underpinnings of the Department's dismissal of Sliwinski from his job, see WIS. STAT. RULE 904.01 ("`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."), but, as we have seen, it is also within the core of Sliwinski's right to due-process fundamental fairness. Thus, the hearing examiner did *438 not apply the correct legal standard when he ruled that the evidence was not relevant.
¶ 16. Sliwinski is entitled to a fair hearing, and that means access to witnesses and evidence that could support his defense. As Umhoefer recognizes, a remand to the Board for a hearing consistent with an officer's due-process rights is an appropriate remedy. Id., 2002 WI App 217, ¶¶ 21-22, 257 Wis. 2d at 552, 652 N.W.2d at 418. Although Sliwinski seeks to have us order his reinstatement, we are not a fact-finding court, Wurtz v. Fleischman, 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 n.3 (1980), and he points to nothing that permits our usurpation of what is properly and appropriately a function of the Board. We thus remand to the Board of Fire and Police Commissioners for a new hearing that complies with Sliwinski's due-process rights.[4]
*439 By the Court.  Order reversed and cause remanded with directions.
*440 
NOTES
[1] There is nothing in the Record to indicate that the person who let Bonilla and Velasquez into the rooms was not employed by the hotel. It seems odd, however, that the FBI would either subject the success of its operation to a housekeeper's willingness to let the detectives into the room, or that it would share with the hotel information about the operation or the coverstory of an impending drug deal. Indeed, the formal complaint filed against Sliwinski by the then chief of police alleges that Bonilla and Velasquez were unable to persuade the "front desk clerk" to let them into the rooms because "they did not have a warrant." Thus, there is no support for the Department's representations to us in its appellate brief that a Milwaukee police captain gave Bonilla an assignment to go to the hotel "and execute a search warrant for drugs and drug money," or that the detectives were on a "search warrant execution." The FBI's typed report of what Bonilla told them indicates that Bonilla and Velasquez "decided to go up and do a knock and talk to see if anyone was at the hotel suite and whether they would talk with them" and that when "the cleaning lady opened the door and said no one was in there," Bonilla and Velasquez "entered and did a cursory search" at first and a more thorough search after they were told by Bonilla's captain that the "suspects" had fled, "leaving one pound of weed and $18,000." This tracks the chief of police's complaint against Sliwinski, which alleged that Bonilla and Velasquez "were able to convince a housekeeper to let them into the two rooms."
[2] The Record does not explain the following anomaly. The videotape in the Record identified as from the surveillance of Room 206 by Camera 1 shows one of the FBI agents placing the paper bag of money in a well underneath the lower-most drawer of the dresser on which is perched a television set. It appears from the tape that the well is recessed below a raised "fence" area on which the drawer fits and slides. After the agent placed the money in this well, he slid the drawer back in. It does not appear that there was any resistance, which there might have been if the bag of money were being forced out of the well onto the floor between the dresser and the wall against which the dresser was placed. The videotape in the Record identified as from the surveillance of Room 206 by Camera 2, however, shows Bonilla retrieving the bag of money from behind the dresser, not, apparently, the well into which the agent put the bag. Sliwinski's brief-in-chief on this appeal asserts in its statement of facts that "Bonilla found a brown paper bag containing money behind a television stand." Additionally, the videotape in the Record identified as from the surveillance of Room 208 shows Bonilla walking into that room with a paper bag in his hand several seconds before he is shown finding it in Room 206 (we acknowledge that this might be attributable to a clock-error on one or both of the video cameras).
[3] Although Klugiewicz referred to "Title 3 regulations," and the assistant United States attorney referred to "the CFR" (presumably meaning something from the shelves of volumes making up the Code of Federal Regulations), neither party has cited or given to us the text of the provisions to which either Klugiewicz or the assistant United States attorney were referring.
[4] There are four additional things that the Board should consider on remand. First, as we saw in footnote 1, it is odd that the FBI would have pinned the success of the sting on a housekeeper's willingness to let the detectives into the rooms without a warrant or a direction from hotel management. Moreover, a video of the surveillance of Rooms 208 and 206 after the detectives had left shows the "housekeeper," among other things, checking behind the television set in each room and the dressers on which they sat. Second, as we point out in footnote 2, Bonilla appears from the tapes to find the paper bag with the money in a place different from where it was placed by the FBI agent. Third, as we also point out in footnote 2, the videotapes in the Record identified show Bonilla walking into Room 208 with a paper bag in his hand several seconds before he is shown finding it in Room 206, although, as we observe in footnote 2, that anomaly might be out-of-synchronization video-camera clocks. Fourth, as noted above, Sliwinski testified that FBI agents told him that there was audio surveillance of the rooms. Although law-enforcement officers may, depending on the circumstances, lawfully mislead suspects whom they are interrogating in order to encourage a confession, State v. Triggs, 2003 WI App 91, ¶¶ 1, 14-17, 264 Wis. 2d 861, 864, 870-873, 663 N.W.2d 396, 397, 400-402, what Sliwinski says the agents told him, and what Sergeant Hampton also told him, coupled with the Department's strident resistance to disclosing evidence that might reveal the full nature of the sting set-up, is another area of appropriate inquiry on remand.