# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-4143

ROBERT C. BRAUN,

*Plaintiff-Appellant,*

v.

LEVERETT BALDWIN, *et al.,*

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-852—**Rudolph T. Randa**, *Chief Judge.*

———————

ARGUED MAY 27, 2003—DECIDED OCTOBER 10, 2003

———————

Before BAUER, POSNER, and COFFEY, *Circuit Judges.*

POSNER, *Circuit Judge.* September 5 is "Jury Rights Day" in Milwaukee. On that day in 2000, Robert Braun, the plaintiff in this civil rights suit under 42 U.S.C. § 1983, and his companion-in-arms William "Whistleblower" Currier, as was their custom on Jury Rights Day entered the Milwaukee County Courthouse for the purpose of advocating jury nullification, that is, that jurors should feel free to disregard the instructions on the law that judges give them. They stationed themselves in the lobby of the courthouse. Currier was dressed in a judicial robe and carried a sign that said, "Why do judges hide the truth?"—the "truth" referred to

apparently being that juries can acquit in criminal cases lawlessly. He handed persons entering the lobby, who may have included witnesses and even jurors, pamphlets advocating jury nullification. Braun stood by, holding a camera, apparently to enable him to obtain evidence, which might provide a basis for litigation, of any attempt by courthouse personnel to expel the judge-impersonating "Whistleblower." Braun and Currier are serial protesters and arrestees; they appear to be "dedicated to the propagation of litigation." *Currier v. Baldridge*, 914 F.2d 993, 994 (7th Cir. 1990).

A sheriff's deputy named Frank Franckowiak, the only defendant who belongs in the case (the other two defendants—the sheriff himself and Milwaukee County—have no possible legal liability for the conduct about which Braun is complaining), observing but doing nothing to impede Currier's antics, noticed that Braun, standing at a distance from Currier, was taking pictures of the officer. Franckowiak was on the alert for trouble because someone had phoned the police that there was a "disturbance" taking place in the courthouse and he had been told about the call. He approached Braun and asked him what his business in the courthouse was. Braun refused to answer and instead threatened to sue Franckowiak, who in response asked Braun to "step aside." (Braun admits this, while also claiming that Franckowiak told him to leave the building altogether.) When Braun refused, Franckowiak arrested him for disorderly conduct. No charges were filed; nor was Braun jailed—he was merely expelled from the courthouse, though later permitted to return. But the arrest precipitated this civil rights suit for infringement of freedom of speech and for false arrest—Braun's threat to sue had not been an idle one. Braun also claims to have been subjected to excessive force in the course of his arrest, mainly because the

handcuffs were fastened too tightly, *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1043-44 (7th Cir. 2002), but as there is no indication that his arrest was effected in an unusual or improper manner, the excessive-force claim has no possible merit. The district court granted summary judgment for the defendants on all counts.

We address the free-speech issue first. When Franckowiak arrested Braun, he may not even have known that Braun was present to assist Currier in advocating jury nullification. In that event, even if the arrest had been improper (the second issue that we consider), it could not have been intended to curtail Braun's freedom of speech. *Rakovich v. Wade*, 850 F.2d 1180, 1189-90 (7th Cir. 1988) (en banc). For that matter, we don't know whether Braun had any intention of speaking or pamphleting or otherwise exercising a claimed right of free speech, so we don't know whether there was even an unintentional interference with his freedom of speech. Currier was not intimidated by Braun's arrest and continued handing out his pamphlets in the courthouse lobby without interference.

But there is a deeper problem with Braun's free-speech claim. First Amendment rights are not absolute. If they were, it would be unconstitutional for states or the federal government to provide a legal remedy for defamation, to punish the possession and distribution of child pornography, to forbid the publication of military secrets, to ever conduct legal proceedings in camera, or, coming closer to home, to prevent Currier and Braun from handing their pamphlets advocating jury nullification to jurors sitting in the jury box. Although advocacy of jury nullification could no more be flatly forbidden than advocacy of Marxism, nudism, or Satanism, we cannot think of a more reasonable regulation of the time, place, and manner of speech than to forbid its advocacy in a courthouse.

"A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." *Cox v. Louisiana*, 379 U.S. 559, 562 (1965); see also *United States v. Grace*, 461 U.S. 171, 177-78 (1983); *Ryan v. County of DuPage*, 45 F.3d 1090, 1095 (7th Cir. 1995) (distinguishing *Cohen v. California*, 403 U.S. 15 (1971)); *Dorfman v. Meiszner*, 430 F.2d 558, 561 (7th Cir. 1970) (per curiam); *Pouillon v. City of Owosso*, 206 F.3d 711, 716 (6th Cir. 2000) (dictum). As we explained in *Sefick v. Gardner*, 164 F.3d 370, 372-73 (7th Cir. 1998) (citation omitted), a case that involved a kinetic statue in the lobby of the federal courthouse in Chicago satirizing one of the judges in the building—a kind of robotic version of Whistle-blower Currier—"the lobby of the courthouse is not a traditional public forum or a designated public forum, not a place open to the public for the presentation of views . . . . Courts seek to induce in the jurors, witnesses, and litigants who pass through the lobby on the way to the courtrooms a serious cast of mind. . . . The judiciary does not show reruns of the Three Stooges in courthouse lobbies, and from the perspective of promoting the judicial mission a sculpture satirizing judges would be worse than old physical comedies. No one doubts that displays in courtrooms and adjacent corridors may be limited to the icons of government, such as seals and flags, and that judges may insist that all those present behave in a dignified manner. Why should this be less true of the lobby? Newspapers and the streets outside are open to scathing criticism of what happens within the courthouse. But the halls of justice may be kept hushed."

The Supreme Court in the passage we quoted from *Cox*, and our own court in the passage we just quoted from *Sefick*, might have been speaking of this case. Jurors have the power, but not the right, to ignore the judge's instructions.

A defendant's lawyer isn't permitted to argue to the jury that it should disregard the law, *Sparf v. United States*, 156 U.S. 51, 102 (1885); *Gibbs v. VanNatta*, 329 F.3d 582, 584 (7th Cir. 2003); *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997); *United States v. Manning*, 79 F.3d 212, 219 (1st Cir. 1996)—a restriction on speech that does not violate the Constitution. Currier and Braun have no greater right than a criminal defendant's lawyer to tell jurors in the courthouse to disobey the judge's instructions. Or to impersonate a judge; cf. *Ryan v. County of DuPage*, *supra*, 45 F.3d at 1092, upholding against First Amendment challenge a rule banning the wearing of masks in court. The biggest surprise in this case is that the Milwaukee justice system tolerates Currier's antics, aided and abetted by Braun. If it thinks the First Amendment requires this, it is mistaken. *Sefick* makes that clear; and see *United States v. Ogle*, 613 F.2d 233, 242-43 (10th Cir. 1979), rejecting a challenge based on the First Amendment to a conviction for obstruction of justice for giving a juror a pamphlet advocating jury nullification. See also *Turney v. State*, 936 P.2d 533, 541 (Alaska 1997); *Zal v. Steppe*, 968 F.2d 924, 932-33 (9th Cir. 1992) (concurring opinion).

We turn now to the second issue, which is whether Franckowiak had probable cause to arrest Braun. The ordinance under which Braun was arrested provides that "no person shall engage in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke a disturbance." Milwaukee County Code § 63.01(1). (The state's disorderly-conduct statute is almost identical. Wis. Stat. § 947.01(1).) Although Franckowiak testified at his deposition that Braun was abusive, boisterous, and unreasonably loud, this testimony is disputed by other witnesses, including Braun, and so cannot

be taken as true in the current posture of the case. And it is not contended that Braun was violent, indecent, or profane. But that leaves the catchall "or otherwise disorderly." We must consider whether his conduct in refusing to explain to the officer why he was taking a picture of him, and instead threatening to sue him, and then refusing to step aside to continue his argument with the officer when ordered to do so, created probable cause, in a courthouse seething with rumor of disturbance, to believe that he was being disorderly in circumstances in which his behavior could provoke or exacerbate a disturbance.

Bearing in mind the emphasis that Wisconsin's highest court places on the coalescence of conduct with circumstances in deciding whether conduct is disorderly, see, e.g., *City of Oak Creek v. King*, 436 N.W.2d 285, 289 (Wis. 1989), we think there was probable cause for Braun's arrest. The altercation took place in a courthouse lobby, during working hours. It is conceded that other persons besides Braun, Currier, and the officer were present—other persons who can be assumed to have had business in the courthouse and who, for all that Franckowiak could have known, might have been witnesses or jurors. These persons would have observed the strange spectacle—rendered stranger by Currier's antics—of Braun's photographing a police officer, refusing to explain why, threatening to sue him, and refusing his order to step outside the lobby. This conduct disturbed the sedate, irenic, dignified, solemn, and even hieratic ("temple of justice") ambiance that courthouses seek to preserve.

It is not a case of a person who, accosted on the street by a policeman who has no reason to suspect him of unlawful behavior, refuses to answer the policeman's questions, as he is entitled to do. *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *Terry v. Ohio*, 392 U.S. 1, 34 (1968) (concurring opinion);

*United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2001). Braun's arrest occurred after the catastrophic bombing of a federal building in Oklahoma City in 1995 engendered heightened fears for the security of government buildings. Even before then courthouses had been recognized as potentially dangerous places because of the presence of criminal defendants, bitterly divorcing spouses and custody-contesting ex-spouses, and other highly stressed, emotionally excited, and even violence-prone litigants. Because of the character of a courthouse's clientele and the importance of preserving a calm atmosphere for the sake particularly of the lay people—witnesses and jurors, outsiders to the legal system—who nevertheless play a vital role in the administration of justice, police and guards are entitled to exercise a degree of control that would be oppressive in a different setting. Currier's grotesque display, Braun's picture taking and obstinateness, and the telephone warning about a disturbance in the courthouse, taken all together, justified a prudent officer in taking steps to head off possible trouble.

Moreover, as we explained in *Ryan v. County of DuPage*, *supra*, 45 F.3d at 1093, defiance of a police officer's order to move is itself disorderly conduct if the order is lawful. We were dealing in that case with Illinois law, but Wisconsin law appears to be the same; compare *City of Oak Creek v. King, supra*, 436 N.W.2d at 289-90, upholding the disorderly-conduct conviction of a person who had refused to obey a lawful police order, with *State v. Werstein*, 211 N.W.2d 437, 440-41 (1973), reversing the convictions of defendants who had refused to obey an unlawful order. So let us consider, as a possible alternative justification for the arrest of Braun, whether the order that he step aside was lawful. We think it was. His action in refusing to explain why he was photo-graphing a police officer who had done nothing provocative

or illegal, occurring as it did in the lobby of a courthouse where a judge impersonator was pamphleting passersby and a report of a disturbance had been received, would have led a reasonable officer to fear that a disturbance of the peace of the courthouse was imminent, making it prudent to remove Braun at least temporarily from the immediate scene. *Terry v. Ohio*, *supra*, 392 U.S. at 20-27, allows police to stop a person and pat him down for weapons upon mere reasonable suspicion. The grounds for suspicion here were insufficient to have justified a typical *Terry* stop involving a search for weapons, but the intrusion on personal privacy and liberty involved in being asked to step aside is less than that involved in a pat down for weapons, sufficiently less to be reasonable in the circumstances.

The case that provides the strongest support for Braun's position—though it is a case that his lawyer, with an insouciance characteristic of his representation of his client in this court, has not bothered to cite—is *State v. Werstein*, *supra*. The Supreme Court of Wisconsin held in that case that it was not disorderly conduct for four draft protesters during the Vietnam War to refuse a police officer's order to leave a military induction center. Although we have called them "protesters," it appears from the stipulation of facts on which the court based its decision that they were just sitting quietly in the induction center, being there to lend moral support to an inductee who was planning to refuse induction. *Id.* at 438. The center was a public place and they had a right to remain in it as long as they were not interfering with the induction process; and so far as appears they were sitting as quietly as mice. The Milwaukee County courthouse is public too, but of a special sensitivity as we have seen and here was Braun arguing with a police officer, taking photographs of the officer, refusing to explain what he was doing—and this against the background of Currier's

disruptive, or at least distracting, impersonation of a judge and the rumor of a disturbance. In these unusual circumstances, we think the officer was within his rights to order Braun to step aside.

Probable cause is not proof beyond a reasonable doubt, or even proof by a preponderance of evidence. So although Braun's conduct was at the margin of the disorderly-conduct ordinance, there was enough evidence of a violation of that capaciously worded regulation—which is not however challenged in Braun's appeal (or challengeable, see *City of Oak Creek v. King, supra*, 436 N.W.2d at 291) as unreasonably vague or overbroad—to justify the arrest.

AFFIRMED.

COFFEY, *Circuit Judge*, dissenting. On September 5, 2000, Robert Braun and his partner, William Currier, were peacefully passing out pamphlets in the lobby of the Milwaukee County courthouse—and were granted express permission from the Milwaukee County Sheriff to do this—when (according to Braun) Deputy Sheriff Frank Franckowiak "accosted [him] first by stating that [he] could not pass out papers or take pictures inside the courthouse." *See* Braun's Certified Declaration ¶ 5. Braun further alleges that Franckowiak "showed anger toward [him] before [he] had a chance to respond to [Franckowiak's] claim that [he] was doing something wrong," and Franckowiak, when asked by

Braun what ordinance prohibited his pamphleting and photography activities, "would not answer." *Id.* ¶¶ 5, 7, 9.

According to Braun, Franckowiak then "told [Braun] that [he] must leave the building *immediately* or face arrest." *Id.* ¶ 9. When Braun "said [he] didn't intend to leave [the building] unless [Franckowiak] could tell [him] what authority he was relying on to order [him] from the building," *id.* ¶ 10—obviously *a reasonable response under the circumstances, considering the fact that he <u>had</u> received the Sheriff's permission to pass out pamphlets in that very area (the hallway of the courthouse), and <u>had</u> been assured that the County's deputy sheriffs would not interfere with such activities*—Franckowiak stated, "you're coming with me," and immediately put Braun under arrest for disorderly conduct. *See* Braun Dep. at 38. The charge against Braun was ultimately dropped, and Braun filed this civil rights claim against Franckowiak under the First and Fourth Amendments. The district court granted summary judgment in favor of Franckowiak on all counts.

Regarding Braun's claim that his First Amendment "right" to pass out pamphlets was violated by the arrest, I am in agreement with the majority that Braun has no First Amendment right to pamphlet inside the Milwaukee County courthouse, for the courthouse lobby *is not and never has been a public forum; nor has it ever been designated a limited public forum.*[1] As this Court stated in *Sefick v. Gardner*, "[t]he

---

[1] Indeed, Mr. Braun may be getting more than he bargained for in the instant appeal if this Court's opinion wakes Milwaukee County up to the fact that it need not open the doors of the Milwaukee County Courthouse to Braun and Currier to distribute leaflets professing jury nullification, solely out of fear of being

(continued...)

lobby of [a] courthouse is not a traditional public forum or a designated public forum, *not a place open to the public for the presentation of views.*" *Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998) (emphasis added). Thus, the County Courthouse falls into the category of government property known as "nonpublic fora," over which "the government may exercise *considerable selectivity*" in "deciding what may be displayed" or what other expressive activity may be permitted therein. *Id.* at 372 (emphasis added).

The Milwaukee County Courthouse being a nonpublic forum, I concur with the majority that neither Braun nor anyone else had any First Amendment right to pass out jury nullification fliers on "Jury Rights" day (or any other day), and agree with the majority's decision to affirm the district court's grant of summary judgment against Braun as to his First Amendment claim. I would also add that Milwaukee County officials certainly have the authority, if they so choose, and would indeed be well advised to enact and impose reasonable and viewpoint-neutral restrictions on speech or other activity in the area inside the Milwaukee County Courthouse. *See United States v. Kokinda*, 110 S. Ct. 3115 (1990) ("regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness.").

On the other hand, I wish to make clear that I am forced to dissent from this Court's affirmance of the district court's

---

[1]  (...continued)

subject to suit. *See* Oral Argument Transcript (statement of Milwaukee County's attorney that the County "acknowledg[ed] [Braun's and Currier's] right to [pass out pamphlets]" in the courthouse simply because it was "tired of being sued by these people [Braun and Currier]."

grant of summary judgment as to Braun's unlawful arrest claim, and would reverse and remand that issue for trial, because based upon all the facts and circumstances, when considered in their totality, as well as the explicit permission Braun had been given by the Milwaukee County Sheriff to pass out pamphlets, I am convinced that Officer Franckowiak did not have probable cause to arrest Braun for disorderly conduct under the Milwaukee County Ordinance.

Deputy Franckowiak admits that Braun was "*free to distribute literature*" in the courthouse lobby on Jury Rights day (September 5, 2000), so long as his conduct was orderly. *See* Franckowiak's Br. at 3 (emphasis added). And the facts recited in the record, "view[ed] . . . in the light most favorable to [Braun]," *Palmer v. Marion County*, 327 F.3d 588, 590 (7th Cir. 2003), support that Braun's leafleting activities *were* entirely peaceful and did not disrupt the traffic flow in the courthouse lobby. *See infra* at 17-21. As for the appellant Braun's discussion with Officer Franckowiak, Braun claims that he was "n[either] loud, obstructive, [n]or uncooperative." *See* Braun's Opposition to Summary Judgment at 2; Currier Aff. ¶ 10 ("Braun . . . was not loud or boisterous [in] responding to questions from Deputy Franckowiak."). And, notwithstanding the majority's assertion that "Franckowiak . . . asked Braun to 'step aside,' [and] Braun refused . . .," Opinion at 2, both Franckowiak and Braun—the two principals involved in the discussion—*deny on the record that Franckowiak ever gave Braun an order to "step aside" (or that Braun refused to comply such an order).* Further, Franckowiak himself states that "*the only thing [he (Franckowiak)] [ordered] [Braun] to do [was] to come with [him]" into custody, and "[Braun] obeyed . . . .*" *See* Franckowiak Dep. at 15. Given these facts, Braun did not at any time engage in *any* behavior that would support probable cause for his arrest on a

disorderly conduct charge; thus, I respectfully dissent from the majority's decision to affirm the district court's grant of summary judgment to Franckowiak on this issue.

The Rule 56(c) summary judgment standard provides for the granting of summary judgment *only* when "*the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.*" Fed. R. Civ. P. 56(c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly in the instant case, in performing *de novo* review of the district court's grant of summary judgment, *Ornelas v. United States*, 517 U.S. 690, 699 (1996), *we must view all facts and draw all inferences in favor of the petitioner-appellant Braun. Outlaw v. Newkirk*, 259 F.3d 833, 836 (7th Cir. 2001).

In granting Officer Franckowiak summary judgment as to Braun's Fourth Amendment unlawful arrest claim, the district court stated: "the undisputed facts clearly establish that Franckowiak had probable cause to arrest Braun for disorderly conduct." *Braun v. Baldwin*, No. 01-CV-852, at *9 (E.D. Wis., November 14, 2002). Braun in response to this finding argues that the district court failed to view all the facts in the light most favorable to him, and that the undisputed facts and circumstances in the record fall short of supporting a finding of probable cause. The majority has ruled that the district court's grant of summary judgment to Officer Franckowiak was proper, but I am convinced that, viewing all the facts in the light most favorable to Braun, as we must, Franckowiak did *not* have probable cause to arrest Braun under the Milwaukee County disorderly conduct ordinance. I thus disagree with the majority's conclusion to the contrary.

It is well-settled that an officer has probable cause to make an arrest *only* when " 'the facts and circumstances within [his] knowledge and of which [he has] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or is committing an offense.' " *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (quoting *United States v. Gilbert*, 45 F.3d 1163 (7th Cir. 1995)). Resolution of the probable cause question "typically falls within the province of the jury. . . ." *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 473 (7th Cir. 1997). A conclusion that probable cause exists as a matter of law is only "appropriate when *there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.*" *Id.* (emphasis added). Thus, for us to affirm the district court's finding of probable cause, *we must be convinced (and I am not) that the undisputed facts point to only one reasonable conclusion—that probable cause was present.*

The Milwaukee County Municipal Ordinance (the "Ordinance") under which Braun was arrested, reads:

> No person shall engage in violent, abusive, indecent, profane, boisterous, unreasonably loud, or *otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke a disturbance.*

> Milwaukee County Code ¶ 63.01(1) (emphasis added).

The majority notes that "Braun was [not] violent, indecent, or profane," Opinion at 6; thus, his conduct comes within the ambit of the Ordinance (if at all) only through the "catchall" "*otherwise disorderly*" phrase, which is further defined and limited in the very language of the Ordinance's requirement that the conduct be of the type that, under the circumstances, "tends to cause or provoke a disturbance." *Id.* That is, Officer Franckowiak had probable cause to arrest

as a matter of law *only* if the facts were sufficient to warrant a prudent person to believe that Braun engaged in or was *engaging in conduct that was both "disorderly" <u>and</u> furthermore would "tend[] to cause or provoke a disturbance" under the circumstances. Id.* Viewing the facts in the light most favorable to Braun, as we must at this stage of the litigation, Braun's actions did not fulfill the probable cause requirement so vital to his arrest made under the Ordinance.

According to Braun, the facts are as follows: beginning at 8:15 a.m. on September 5, 2000, Braun and his partner, William Currier, were standing in the middle of the first-floor lobby of the Milwaukee County courthouse, located in the City and County of Milwaukee, Wisconsin, and offering and "handing out [jury nullification] fliers" to anyone who would take them. *See* Braun Dep. at 32. It is accepted by both parties that, prior to that date, the then County Sheriff, Leverett Baldwin, had sent Currier a letter "assur[ing] Currier and [Braun], that Deputy Sheriffs from Milwaukee County *would not interfere with peaceful and orderly pamphleting at the courthouse by issuing citations of disorderly conduct or otherwise.*"[2] *See* Amended Complaint ¶ 8 (empha

---

[2]   The fact that the Sheriff agreed "not to interfere with [Braun's] peaceful and orderly pamphleting at the courthouse," *see* Amended Complaint ¶ 8, has been (surprisingly, as my colleagues point out) uncontested by the County. *See* Defendants' Answer ¶ 8 ("admit[ting] that [Baldwin] sent" a letter to Braun and Currier agreeing "not [to] interfere with peaceful and orderly pamphleting at the Courthouse," Amended Complaint ¶ 8). Apparently, some time prior to the incident in question, passing out fliers in the lobby of the courthouse had been prohibited by a judicial directive issued on September 8, 1992, but this directive had been rescinded by then-Chief Judge of Milwaukee County in

(continued...)

sis added); Answer ¶ 8 ("admit[ting] that [such] a letter [of permission] was sent [by the Milwaukee County Sheriff] to Currier as alleged [by Braun] . . . ."). *See also* Robinson Dep. at 10 (stating that the men were "allowed" to stay and pamphlet "as long as [they] did not cause a disruption . . ."). (Although Franckowiak, Braun and Currier each admit that Currier received a letter of permission from the Sheriff to pamphlet in the courthouse hallway, that letter, for reasons unexplained, is not contained in the record.)

At approximately 9:20 a.m. on the date of September 5, 2000, Deputy Sheriff Janet Robinson was sent to the ground floor of the Milwaukee County Courthouse to investigate a complaint about a disruption made by an unidentified complainant. Upon arrival, she approached Mr. Currier (she claims initially she did not notice Braun) and remarked that, at that time, "it didn't appear that [Currier] was causing a disturbance." Robinson Dep. at 9. She told Currier to leave (she claims not to have talked to Braun), but Currier refused: "[N]o, I won't leave. . . . I have a right to stay here."

---

[2]  (...continued)

1995, well before Braun's arrest in this case (September 5, 2000). It is also undisputed that, shortly after the directive was lifted, the Sheriff of Milwaukee County, Leverett Baldwin, informed Currier by letter "that deputies would not interfere with [his] peaceful and orderly pamphleting at the Courthouse" on Jury Rights Day. *See* Amended Complaint ¶ 8. At oral argument, Franckowiak's counsel admitted that Milwaukee County has "erred on the side of liberality in that we do permit these gentlemen to come to the courthouse every year on September 5" to pass out jury nullification pamphlets. Indeed, Braun and Currier have passed out pamphlets on prior occasions, in particular in the years of 1997 and 1998, without any problems. *See* Braun Dep. at 26-27 (noting that they "skipped" the year 1999).

*Id.* at 10. Currier went on to state to Robinson that he had "sued the county before" and said "that [she] should talk to [her] sergeant" about the issue. *Id.*

As Robinson moved away from the immediate area to call her sergeant (Jeffrey Bilda), Braun snapped her picture. At this time, she (Robinson) recognized Braun from prior contacts and conversations with him in the courthouse. *Id.* at 5-6, 11 ("I knew who Mr. Braun was"). Robinson further testified that although she thought Braun's picture-taking was "unusual," nothing Braun had done in her presence was "loud," "boisterous" or "causing a disturbance." *Id.* at 13, 15. According to Robinson, Sergeant Bilda, in his phone conversation with her, thereafter confirmed to her that "as long as there was no disruption, as long as people weren't milling around [or] crowding around, [Braun and Currier] [we]re entitled to stay [in the hallway]" passing out pamphlets. *Id.* at 13. Having observed none of the problems Sergeant Bilda recited, Robinson proceeded to leave the area. *Id.* at 13.

Meanwhile, Deputy Sheriff Frank Franckowiak arrived on the scene, and recognized Braun, because he had "r[un] across [Braun] a couple times" before when Braun was at the courthouse for other reasons. *See* Franckowiak Dep. at 3. As Franckowiak approached, Braun admits that he "took a picture [of Franckowiak]" from a distance of about 20 feet away. *See* Braun's Certified Declaration ¶ 3.

Franckowiak, for his part, concedes that "when [he] arrived [at the scene, he] didn't see any . . . disturbance," and admits that there was "no[thing] loud" taking place, and absolutely "*nothing going on . . .*" in the area of Braun's

pamphleting activities.[3] *See* Franckowiak Dep. at 10 (em--phasis added). Nonetheless, Braun claims (and we must accept as true) that Franckowiak came right up to him, "accosted [him] first by stating that [he] could not pass out papers or take pictures inside the courthouse," *see* Braun's Certified Declaration ¶ 5, and then ordered Braun "*to leave the building right now, immediately.*" *See* Braun Dep. at 38 (emphasis added). Braun alleges that Franckowiak "showed anger toward [him] before [he] had a chance

---

[3] The majority states that "we don't know whether Braun had any intention of speaking or pamphleting," Opinion at 3, and that "[w]hen Franckowiak arrested Braun, he may not even have known that Braun was present to assist Currier in advocating jury nullification." *Id.* But if we are to believe Braun's testimony (as we must, at this stage), Braun *was* pamphleting that day, because in his deposition testimony he stated that he was present in the courthouse lobby that morning "handing out [jury nullification] fliers." *See* Braun Dep. at 32. As far as whether Franckowiak was *aware* of the pamphleting, we must also accept Braun's claim that, upon arriving at the scene, Franckowiak informed him (Braun) that he "*c[ouldn't] hand out papers in this hall . . . .*" *Id.* at 37 (emphasis added). Obviously, contrary to and in direct opposition to the majority's statement that "Franckowiak . . . may not even have known that Braun was . . . advocating jury nullification" by passing out jury nullification pamphlets, Braun's claim that Franckowiak immediately told him he could not hand out papers in the hall would serve to establish that Franckowiak *did* know Braun was passing out pamphlets (otherwise, why would the officer have asked him to stop?). In any event, Franckowiak in his own deposition testimony admitted that Currier was pamphleting, and furthermore admitted to recognizing that the two men were "most likely" together because he had "seen them do this before." *See* Franckowiak Dep. at 12. Thus, it seems quite evident that Franckowiak *was* aware of Braun's pamphleting activities.

to respond to [Franckowiak's] claim that [he] was doing something wrong," and that Braun, while making a reasonable inquiry of Franckowiak, asked what ordinance prohibited his pamphleting and photography activities, but Franckowiak "would not answer." Braun's Certified Declaration ¶¶ 5, 7.

Braun and Franckowiak agree that Braun continued to talk and explained to him (Franckowiak) that he "didn't have to listen to [Franckowiak]," *see* Franckowiak Dep. at 9, or, as Braun put it, that he "didn't intend to [obey Franckowiak's order to] leave unless [Franckowiak] could tell [him] what authority he was relying on to order [him] from the building." *See* Braun's Certified Declaration ¶10. This statement did not rise to the level of "disorderly conduct," however, for "*[s]urely one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable [order] by a police officer.*" *Norwell v. City of Cincinnati*, 414 U.S. 14, 16 (1973) (per curiam) (emphasis added).

Braun also does not deny that he threatened to sue Franckowiak, and admits that he "refused to answer [Franckowiak's] questions regarding his reason for being in the courthouse, because it was so clear that [he] w[as] present [to] pass[] out literature [as part of a] peaceful[] protest[]." *See* Amended Complaint ¶ 11. Indeed, it evidently *was* clear to Franckowiak that Braun was there to pass out pamphlets, for (as he admitted at deposition) he had seen Braun and Currier "[pass out pamphlets] the year before [and] many times before." *See* Franckowiak Dep. at 10. Moreover, according to Braun, the first thing out of Franckowiak's mouth (upon his approach) was a declaration "that [Braun] could not pass out papers or take pictures inside the courthouse . . .," *see* Braun's Certified Declaration

¶ 5; Braun Dep. at 38; thus, Franckowiak *must* have known Braun was passing out fliers in the courthouse that day.

Braun and Franckowiak dispute whether Braun was disruptive in his dealings with Officer Franckowiak. On the one hand, Braun says that he was "*not* loud, obstructive or uncooperative" with Franckowiak. *See* Braun's Memorandum In Opposition to Summary Judgment (September 23, 2002) at 2; Currier Aff. 10 ("Braun was not . . . loud or boisterous with respect to responding to questions from Deputy Franckowiak"). And although Officer Franckowiak admits that "when [he] arrived [at the scene, he] didn't see any . . . disturbance," he claims that Braun eventually became "loud, obstreperous and uncooperative" in responding to Franckowiak's inquiries in the hallway, *see* Franckowiak's Proposed Findings of Fact ¶ 18, an assertion supported by Officer Keith Kolodzyk's testimony that Braun was "being loud" as he addressed Officer Franckowiak. *See* Kolodzyk Dep. at 10. Obviously, this is *another dispute* in the testimonial evidence which *serves to create an issue of fact that must be left to a jury of Franckowiak's and Braun's peers* and thus may not be resolved at this summary judgment stage.

After this brief exchange with Braun, Franckowiak, by his own admission, ordered Braun to "come with [him]," and, still standing in the middle of the hallway, immediately placed Braun under arrest for disorderly conduct. *See* Franckowiak Dep. at 15. At deposition, Officer Franckowiak went on to state for the record that Braun "came along real nice." *Id.* at 17. *Franckowiak* further explained that "*the only thing [he (Franckowiak)] asked [Braun] to do [was] to come with [him] [and that] [Braun] obeyed [that order.]*" *Id.* at 15 (emphasis added). According to Franckowiak, the entire discussion lasted just 30 seconds—in fact, he says, "[i]t could have been [even] shorter than that." *Id.*

Franckowiak, the arresting officer, testified that he *did not observe whether any passersby were bothered by (or exhibited any reaction whatsoever)* to Braun's behavior during the brief 30-second (or less-than-30-second) discussion. *Id.* But Deputy Sheriff Kimberly Dunigan, who also had responded to the scene along with Franckowiak, was standing nearby and observing the entire incident and *noted that Braun was* not blocking *any doorway, courtroom or jury room, and instead remained "basically in the middle of the hallway." See* Dunigan Dep. at 18 (emphasis added). Further, she recounted that, "[d]uring the 30 seconds to a minute that Deputy Franckowiak had confronted Mr. Braun . . . [no] crowd gather[ed]." *Id.* at 26. She also recounted that she saw no one "stop in the hallway" to gawk or watch the scene, nor did she see any passersby "*respond in any way to what Mr. Braun said to Deputy Franckowiak.*" *Id.* at 28 (emphasis added). Finally, although Dunigan stated at her deposition that Franckowiak at one point asked Braun to "step aside," and further stated that Braun refused, this statement likewise is a disputed issue of fact, for *Deputy Franckowiak himself denied giving such a command, testifying instead that "the only thing [he] asked [Braun] to do [was] to come with him [into custody]," and that Braun "obeyed [that order]." See* Franckowiak Dep. at 15 (emphasis added).

Deputy Sheriff Keith Kolodzyk came in "[a]t the end" of Braun's discussion with Franckowiak, *see* Kolodzyk Dep. at 10, and watched as Braun was put under arrest. He confirmed that "[no] crowd gather[ed]" at any point, but, as is frequently the case, one witness sees a situation one way while another interprets it a different way, and Kolodzyk remarked (in conflict with Deputy Dunigan's testimony) that some passersby did "seem[] upset and . . . were moving away" from the area. *Id.* at 16. Most interestingly, Kolodzyk has never specified much less explained how he came to this

conclusion that the alleged passersby seemed "upset," nor has he given any suggestion as to what was in fact causing the alleged passersby to exhibit a reaction.[4]

At this time, after detaining Braun for "[c]lose to an hour," *see* Braun Dep. at 42, Franckowiak finally decided to issue Braun a citation for disorderly conduct—after a nurse intervened after taking Braun's blood pressure—and escorted him out the door of the courthouse building. Braun immediately returned to the scene of the activity and joined Currier, and the two men continued to distribute pamphlets within the building for another 30 to 45 minutes, during which time no other officer made contact with them. Nor did Franckowiak ever again order Braun to cease pamphleting or leave the premises. Ultimately, Braun and Currier decided to leave the courthouse of their own accord.

---

[4] One would like to know whether the alleged reaction of passersby was caused by Braun's purportedly "disorderly" conduct, or perhaps by Deputy Sheriff Franckowiak's allegedly "angry" behavior (which he exhibited in spite of the fact that he was well aware the pamphleting was permitted and furthermore that he had "no problem with [the pamphleting activities] at all," Franckowiak Dep. at 10)? From the facts before us, either scenario is plausible. After all, Deputy Sheriff Dunigan observed that Franckowiak was "irritated by [Braun's] camera," Dunigan at 28, and Braun himself claimed Franckowiak "showed anger toward [him (Braun)]" during their discussion, and refused to give him any "chance to respond" to his (Franckowiak's) allegation that "[Braun] was doing something wrong." *See* Braun's Certified Declaration ¶¶ 5, 7, and 9. Such an unwarranted demonstration of anger toward a peaceful pamphleter may very well have offended the sensibilities of passersby, causing them to "seem upset."

Some months after receiving the citation, Braun appeared in court in response to the disorderly conduct charge issued by Deputy Sheriff Franckowiak. But the charge never went forward, for, at the first in-court hearing in the matter, the district attorney must have agreed with Braun that he could not prove the disorderly conduct charge and moved the court to withdraw the charge. The court acquiesced and dismissed the pending (and indeed most questionable) disorderly conduct charge.

To address the district court's and the majority's conclusions that Franckowiak had probable cause to arrest Braun for disorderly conduct, I must point out that, contrary to the Rule 56(c) summary judgment standard which allows us "*only* [to grant summary judgment if] the record discloses *no dispute as to any material fact*," *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002) (emphasis added), both the district court and the majority of this Court, *in reaching their conclusion to grant summary judgment on the probable cause issue, have improperly relied on "facts" in the record that remain in dispute at this stage.*

The district court, for instance, relies heavily on Deputy Sheriff Kolodzyk's testimony that others in the courthouse lobby " 'seemed upset and . . . were moving away from the disturbance,' " *Braun v. Baldwin*, No. 01-CV-852, at *4 (E.D. Wis., November 14, 2002), to support that Braun's interaction with Deputy Sheriff Franckowiak was "disorderly," and further remarks that *this testimony was "[u]nrebutted" in the record. Id.* This is a misstatement of the record and is not the case, for Deputy Sheriff Kolodzyk's claim that people "seemed upset" *was* rebutted elsewhere in the record—

namely, by Deputy Sheriff Dunigan.[5] Deputy Dunigan—
who was also a witness to the entire scene—testified at her
deposition that *she "[d]id [not] see any person passing by
respond <u>in any way</u> to what Mr. Braun said to Deputy
Franckowiak." Id.* at 28 (emphasis added). Thus, viewing the
facts in the light most favorable to Braun as I have pointed
out earlier we are mandated to do under the ruling case law,
Dunigan's testimony clearly supports the very logical
inference that passersby were *unaffected and uninterested*
by and even *oblivious* of the discussion between Braun
and Franckowiak (perhaps because nothing was going
on)[6]—and this evidence falls far short of supporting
Franckowiak's contention that Braun's behavior "tended to
cause or provoke a disturbance."

---

[5] Furthermore, Deputy Kolodzyk (who claimed that passersby
"seemed upset") at no time gave any specific details or other
information as to *why* he reached the conclusion people "seemed
upset" by Braun's and Franckowiak's discussion; thus, if we
draw all inferences in favor of Braun (as we must), we might just
as well logically assume that those who became "upset" did so
because they witnessed Franckowiak's "anger" toward Braun—
not because they were somehow offended by Braun's conduct.
*See supra* note 4.

[6] Franckowiak being the diligent officer that he is, we may also
presume that if passersby *had* exhibited negative reactions to
Braun's discussion with Franckowiak, Franckowiak would have
done a thorough investigation and obtained the names and con-
tact information of those bystanders in anticipation of the instant
litigation. According to the evidence in the record, no such
bystandards were contacted or otherwise came forward with *any*
testimony—either that they witnessed the exchange between
Braun and Franckowiak, or that they were negatively affected by
the discussion between the two men.

The Court's majority in this case similarly casts aside conflicting evidence in the record when it recites the "fact" that Braun "[refused an order by Franckowiak] to 'step aside' " in support of its conclusion that there was probable cause to arrest. Opinion at 2, 7-9. As an examination of the record reveals, the very person who Dunigan claims gave the "step aside" order—Officer Franckowiak himself—emphatically refuted this allegation at his deposition. Indeed, Franckowiak stated that *he only gave Braun one order—to "come with [him]" into custody—an order with which Braun fully complied. See* Franckowiak Dep. at 15 (emphasis added). *Franckowiak further admitted that he never "instruct[ed] [Braun] to move to a different part of the hallway." Id.* at 14-15 (emphasis added). Moreover, Franckowiak's recitation of his reasons for arresting Braun, recorded on the face of the citation itself, made no mention whatsoever of any "step aside" order (nor of Braun's alleged refusal to obey such an order) as the reason for the disorderly conduct arrest. *See* Braun Aff., Exhibit B (noting only that Braun "stated [that] he didn't have to listen to [Franckowiak] and that he wanted [Franckowiak's] picture to sue [him]" and that Braun "was advised to leave and wouldn't [and was thereafter] [p]laced under arrest and served citation."). It is certainly strange, and I am at a loss to understand how Deputy Dunigan heard Franckowiak give an order that he (Franckowiak) himself claimed he never gave, but one thing is clear: this Court would be foolhardy to accept her word as convincing at this stage, for the very officer (Franckowiak) involved denies and contest Deputy Dunigan's assertion.[7]

---

[7] Braun's version of events likewise seems to contradict Dunigan's allegation that Franckowiak gave Braun (and Braun

(continued...)

[7] (...continued)

refused) an intermediate "step aside" order. While the majority claims that Braun "admits [that Franckowiak . . . asked Braun to 'step aside']," *see* Opinion at 2, the record reflects otherwise, for Braun *never admits* in the record that Franckowiak issued him an order "to step aside from the crowd in the hallway to speak with [Franckowiak]," *see* Franckowiak's Br. at 5.

Braun testified at his deposition that, when Officer Franckowiak approached him, Franckowiak immediately informed him (Braun) that he "c[ould]n't hand out papers in th[e] hallway," *see* Braun Dep. at 38—a false assertion, given that Braun *had* been given permission by the County Sheriff to pass out fliers in the courthouse (as Franckowiak was well aware, *see* Franckowiak Dep. at 10 (admitting "there [wa]s nothing unlawful about [Braun] handing out literature [in the courthouse]" and that he knew Currier and Braun "distributed literature at a certain time every year in September")). *See supra* note 2. Franckowiak then proceeded to "[order Braun] to leave the building" and thereafter (when Braun refused to leave, given that he did have permission to pass out flyers) said, "you're coming with me" and put Braun under arrest. *See* Braun Dep. at 38. *See also* Braun's Br. at 8 ("[Franckowiak told] Braun. . . to leave the building because he could not pass out pamphlets or take his picture . . . [and, a]fter taking Franckowiak's picture, [Franckowiak] grabbed [Braun's] arm . . . [and] placed him under arrest."). Thus, Braun *never* stated either at his deposition or elsewhere in his briefs and court filings that Franckowiak issued him an order (or that Braun refused an order) to "step aside" to discuss his pamphleting activites.

Considering that Braun and Franckowiak *both* deny Franckowiak ever gave (or Braun ever refused to obey) a "step aside" order, it is beyond comprehension that the majority can rely on such a dubious allegation to support the grant of summary judgment to Franckowiak. I refuse to join the majority in
(continued...)

Nor was Braun's arrest justified by the fact that courthouse security breaches such as the Oklahoma City bombings had "heightened fears" connected to courthouse activities, Opinion at 7, *for contrary to the majority's speculation, there is no evidence that Braun has ever posed any security threat in performing his annual Jury Rights day pamphleting activities spanning the years 1993 to 2000. See* Defendants' Memorandum in Support of Summary Judgment at 2-3 ("it is undisputed that from 1993 until 2000, Braun and Currier [participated in] Jury Rights Day annually by distributing pamphlets promoting their views on jury nullification in the Milwaukee County Courthouse *without notable incident.*") After all, Braun and Currier had engaged in peaceful pamphleteering activity inside the courthouse on *at least seven occasions* in the past, and all the evidence suggests that Braun's and Currier's prior Jury Rights day activities occurred without any problems or disturbance (although these activities may have been a nuisance to the Milwaukee County authorities—a nuisance created by their own poor judgment in giving these two men permission to pamphlet on the premises of the courthouse).[8] *See* Defendants' Pro-

---

[7] (...continued)
putting words in Franckowiak's mouth that both Franckowiak *and* Braun deny were ever said, and certainly do not believe that such a flimsy allegation may be used to support a grant of summary judgment to Franckowiak.

[8] Franckowiak admits that Braun and Currier had permission to pass out pamphlets inside the courthouse, and states that, "[w]ith the exception of 1993, Braun participated in the annual observance of Jury Rights day [by passing out pamphlets inside the courthouse] . . . and was not forbidden from doing so, and was not removed from the Courthouse, and was issued no citations
(continued...)

posed Findings of Fact [hereinafter DPFF] ¶ 7, 10 ("With the exception of 1993, Braun participated in the . . . observance of Jury Rights day [by handing out pamphlets in the courthouse on an annual basis, beginning in approximately 1991] and was not forbidden from doing so, was not re-moved from the Courthouse, and was issued no citations until September 5, 2000."). Indeed, Milwaukee County deputy sheriffs—including Franckowiak—*knew* Braun and Currier from prior encounters, and Officer Robinson even conceded that relations with the men were "friendly." *See* Robinson Dep. at 13 ("We have always been on a friendly type basis."). In fact, the Milwaukee County Sheriff—the County's chief law enforcement officer—*being aware of and providing his consent to Braun's and Currier's pamphleting activities, agreed not to interfere with the distribution of leaflets on the courthouse premises on the date in question. See supra* at 15-16. Clearly, the majority's observation in this factual situ-ation that courthouses are "potentially dangerous places" is

---

[8]   (...continued)
until September 5, 2000." Defendants' Proposed Findings of Fact ¶ 10. Braun did receive one citation for distributing the pam-phlets, in 1993, but at that time the Chief Judge of Milwaukee County had previously issued some type of directive prohibiting pamphleting inside the courthouse; therefore, issuing a citation for such activity was entirely proper. The prohibition was there-after rescinded on September 12, 1995, *see supra* note 2; thus, by the date of Braun's arrest in this case (September 5, 2000), there was no prohibition against pamphleting in the courthouse, and in fact Braun and Currier had received express permission to do so, as long as their activities remained "peaceful and orderly." *See id.* Moreover, there is no evidence in the record that, since receiving permission to pass out pamphlets, Braun and Currier had engaged in *any* impermissible or disorderly conduct in connection with their Jury Rights day pamphleting activities.

a scare tactic, for comparing the pamphleting situation in Milwaukee County to the Oklahoma City bombing borders on the extreme. General courthouse security concerns of the Oklahoma City bombing variety had no application here, for Braun and Currier were a known quantity to Franckowiak and his peers due to their prior pamphleting activities (at least seven occasions over a period of nine years).

After clearing up these misstatements in the record, *it is not surprising that the County prosecutor moved to dismiss and the court granted dismissal of the disorderly conduct charge against Braun*, for the prosecutor likewise must have been convinced he would not be able to establish probable cause for the arrest based on the totality of the evidence presented by the complexity of all of the litigants and the witnesses. Indeed, the *only* undisputed facts that Franckowiak relies on to justify his decision to arrest Braun are: (1) Braun's snapping a picture of Franckowiak; (2) his refusal to answer Franckowiak's inquiry as to why he was in the courthouse; and (3) his statement that he "didn't have to listen" to Franckowiak and would sue Franckowiak if he infringed his First Amendment rights. Since when has any one of these acts, or even a combination of some or all of these acts, been the basis for a conviction on a disorderly conduct charge under the Milwaukee County Ordinance?

The taking of the picture of an officer is certainly not adequate to support a disorderly conduct charge, for such activity is not the type that tends to "cause or provoke a disturbance." Franckowiak failed to supply any case law in support of his theory that the mere taking of a police officer's picture has been adjudged an act of disorderly conduct; nor have we, in conducting our research, been able to find any case law in support of his claim. Furthermore, the County did not put forth any ordinance that restricted

or prohibited the use of cameras inside courthouse hallways at the time Braun took Franckowiak's picture.[9] Indeed, the County, at oral argument, *expressly admitted that the fact that Braun took a picture inside the courthouse "was not disorderly conduct."*[10]

Turning to Braun's failure to inform Franckowiak what business brought him to the courthouse, I am similarly unconvinced that his failure to respond to this inquiry was the type of behavior that "tends to cause or provoke a disturbance." Milwaukee County Code ¶ 63.01(1). After all, "*[p]olice officers reasonably may be expected to exercise a higher degree of restraint than the average citizen and should be less likely to be provoked into misbehavior by [offensive] speech.*" *Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003) (emphasis added). Moreover, it *was* obvious what Braun was doing, for Braun was engaged in pamphleting activities in the very courthouse hallway area where (as Franckowiak admits) Braun had been granted permission to pass out pamphlets. And although Franckowiak claims he did not see Braun passing out pamphlets prior to putting him under arrest, Braun vigorously disputes this fact, and claims that *the first thing Franckowiak said to him (Braun) upon approaching him was: "[Y]ou can't hand out papers in this hallway and you can't take pictures in this hallway."* *See* Braun's Dep. at 37. Given

---

[9]   Nor did Milwaukee County put forth any evidence that pamphleting was restricted by ordinance. *See supra* note 2 (discussing Franckowiak's admission that Braun's pamphleting activities were expressly permitted by the Milwaukee County Sheriff himself).

[10]  Officer Robinson, whose picture was taken by Braun, also admitted that Braun "was not loud . . . was not boisterous, and . . . was not causing a disturbance" at any time (including during her own picture-taking incident). *See* Robinson Dep. at 15.

that Franckowiak knew full well who Braun was, and obviously was aware of what Braun was doing in the courthouse, and considering his admission that he *had* seen Braun and Currier passing out fliers on numerous prior occasions inside the courthouse, Franckowiak's demand that Braun explain what he was doing in the courthouse was more likely a harassment tactic than a good-faith request for information in connection with an investigation. In any case, Braun's failure to respond to this inquiry clearly fell far short of " 'warrant[ing] a prudent [person] in believing that [Braun] had committed or [wa]s committing an offense.' " *Mounts*, 248 F.3d at 715 (quoting *United States v. Gilbert*, 45 F.3d 1163 (7th Cir. 1995)).

As for Braun's statements that he "didn't have to listen to" Franckowiak's order to leave the premises, and would file a lawsuit against Franckowiak if he was forced to leave and cease pamphleting, these likewise are obviously inadequate grounds for arrest, for " *[s]urely, one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable [order] by a police officer.*" *Norwell v. City of Cincinnati*, 414 U.S. 14, 16 (1973) (in which a man was placed under arrest after refusing to answer a police officer's inquiry as to whether he lived in the neighborhood, and instead informing the officer, "I don't tell you people anything") (emphasis added). "Regardless of what the motivation may have been behind [Braun's] expression in this case, it is clear that there was no abusive language or fighting words."[11] *Id.*

---

[11] Braun's statements—(1) that he "didn't have to listen to" Franckowiak's assertion that Braun was "not allowed" to pass out papers and (2) that he would sue Franckowiak if forced to stop pamphleting—*fall far outside* the scope of "fighting words"

(continued...)

The Supreme Court has indeed emphasized that "the First Amendment protects a *significant amount of verbal criticism and challenge* directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (emphasis added). As this Court recently asserted, "even profanity-laden speech directed at police officers" qualifies as First Amendment-protected speech. *See Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (emphasis added). Also pertinent to the instant case, we noted that "*arguing* with a police office[r] does not evolve into disorderly conduct merely because a crowd gathers to watch the argument." *Id.* at 777 (emphasis added). Because swearing at and arguing with a police officer do not always rise to the level of disorderly conduct, we noted in *Payne* that "[p]olice officers must be more thick skinned than the ordinary citizen and must exercise restraint in dealing with the public. They 'must not conceive that every threatening or insulting word, gesture, or motion amounts to disorderly conduct.' " *Id.*

Here, Braun did not use *any* profanity; and, although he did question Franckowiak's authority to order him from the courthouse, no crowd gathered around him and Franckowiak during this discussion. Indeed, if Braun's testimony is accurate, *there was no reason for a crowd to gather*, for there was nothing "disorderly" taking place: Braun merely informed Deputy Sheriff Franckowiak that (contrary to Franckowiak's assertions) he *did* "ha[ve] permission to be in the hallways handing out fliers," *see* Braun Dep. at 40,

---

[11] (...continued)
delineated in *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) particularly since Braun claims (and we must accept) that he made the statements in a normal tone of voice, and a calm, "non-boisterous" manner.

and that he would sue if he was forced to leave. Indeed, this was a *reasonable* (though unfortunate) response under the circumstances, considering Braun *had* been advised by the Milwaukee County Sheriff that he could pass out pamphlets in the courthouse lobby that day (a fact that is not disputed by the County), and thus he was of the belief that he was allowed to participate in what Franckowiak was telling him he could not do (*i.e.*, the distribution of fliers in the hall-way).

In any event, it is clear that these statements were neither "threatening, profane [n]or obscene," much less "plainly likely to cause a breach of the peace by the addressee . . .," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573 (1942), and thus do not fall within the ambit of conduct proscribed by the Milwaukee disorderly conduct ordinance. Thus, it is most clear that Braun's conduct did not rise to the level of disorderly conduct under the Ordinance (much less establish probable cause to make an arrest under the Ordinance), if we are to interpret and not make the law.

Though this is the Court's first opportunity to address the Milwaukee County disorderly conduct ordinance, it is worth noting that, in other instances, we have required far more egregious conduct than what is at issue here to support a "disorderly conduct" violation. For example, in *Lester v. City of Chicago*, 830 F.2d 706, 708 (7th Cir. 1987), we considered whether evidence that a defendant had—inside a police station lobby—"*holler[ed] and scream[ed]*" at police officers, "push[ed] people out of her way," and caused onlookers to "*sh[y] away*," was sufficient to support a finding of probable cause under the Illinois disorderly conduct statute. Noting that the defendant in that case had *engaged a police officer in a "loud, offensive argument,"* and that *there was evidence the argument had "disrupted the station's normal activities," id.* at 708, 715 ("[no]thing was getting done [in the

police station] other than [the] hollering"), we held there was sufficient evidence to support a finding of probable cause to arrest for disorderly conduct—*but even in that case, the probable cause question had been left for the jury.*

Likewise, in *Biddle v. Martin*, 992 F.2d 673 (7th Cir. 1993), we concluded that probable cause existed to arrest an intoxicated man for disorderly conduct, because the man had engaged a police officer in a "violent argument," after he was informed by the officer that his car would be towed. *Id.* at 677. We noted that "when a citizen's argument with a police officer is at issue, the key inquiry is [often] *whether there is a clear relationship between the citizen's conduct and the threat to public order.*" *Id.* (emphasis added). We further reasoned that, because the defendant had "scream[ed] profanities at an officer for ten minutes" (something we deemed an unreasonable response under the circumstances), and because the "screaming [wa]s accompanied by violent arm gestures," the "relationship between [the defendant's] unreasonable conduct and a breach of the peace [wa]s clear enough to satisfy the requirements of probable cause." *Id.*

By contrast, in the case before us, Braun claims (and we must accept) that he was "<u>*n[ever] loud or boisterous [in] responding to [Franckowiak's] questions*</u> . . . ." Currier Aff. ¶ 10 (emphasis added). Further, there is no allegation that Braun punctuated his statements with obscenities, hand gestures, much less hand or arm waves. By Franckowiak's own admission, the incident was but a mere 30 seconds long—"[maybe] shorter." *See* Franckowiak Dep. at 15. And, as further evidence that Braun's statements did not "tend to create or provoke a disturbance," I note that *no one had stopped to listen to Braun, no crowd had gathered around him, and no passersby were "respond[ing] in any way to what [Braun] said to Deputy Franckowiak." See* Dunigan Dep. at 28 (emphasis added). Thus, for all we know from the record before us,

people in the hallway in all probability *may not even have paid any attention at all to Braun and Franckowiak's discussion.*[12]

Both Braun and Deputy Dunigan assert that Deputy Franckowiak was angered by Braun's statements to him just prior to the arrest. *See* Braun's Certified Declaration ¶ 5 (noting that Franckowiak "showed anger toward [Braun]"); Dunigan Dep. at 28 (stating that Franckowiak was "irritated by [Braun's] camera" because it was "pretty rude" of Braun to take Franckowiak's picture). While I understand that Braun's behavior may have been annoying to Deputy Sheriff Franckowiak, this alone does not justify an arrest for disorderly conduct (nor an overly-heated response on the part of Franckowiak), for, as noted earlier, "*[p]olice officers reasonably may be expected to exercise a higher degree of restraint than the average citizen and should be less likely to be provoked into misbehavior by [offensive] speech*." *Payne*, 337 F.3d at 776 (emphasis added). And in this case, given the absence of *any* undisputed evidence that Braun's statements were made in a loud or boisterous manner, or that the exchange between

---

[12] We are aware that under Wisconsin law, "[i]t is not necessary that an actual disturbance must have resulted" from a person's conduct for that particular conduct to qualify as the "type which tends to cause or provoke a disturbance." *City of Oak Creek v. King*, 148 Wis.2d 532, 545 (Wis. Ct. App. 1989) (considering the meaning of an identical State of Wisconsin disorderly conduct statute). But Wisconsin law *does* permit consideration of onlookers' subjective reactions as "evidence of [whether, under the] circumstances," a person's actions "tend[ed] to create or provoke" a disturbance. *State v. Migliorino*, 170 Wis.2d 576, 594 (Wis. App. 1992). And in this case, the lack of reaction of passersby (no crowd gathering, people "not responding in any way") suggests that the circumstances were *not* such that Braun's actions in the hallway rises to the level of "disorderly conduct."

Braun and Franckowiak had any type of a disruptive effect on passersby, there is insufficient basis for a finding of probable cause.

Additionally, I would note that even the doctrine of qualified immunity (which Defendant pleaded as an affirmative defense but failed to address in his appellate brief) is unavailable (in my view) as a basis for affirming the grant of summary judgment in this case. An officer is shielded from liability under the doctrine of qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 687 (7th Cir. 2001). To evaluate a claim of qualified immunity, we engage in a two-step analysis, asking: (1) "whether the plaintiff['s] claim states a violation of [his] constitutional rights," and then (2) "whether those rights were clearly established at the time the violation occurred." *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000). "A clearly established right is one where '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.*

In *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998), we addressed the issue of probable cause in the context of a Section 1983 case where the plaintiff disputes whether probable cause exists:

> [w]ith an unlawful arrest claim in a § 1983 action when a defense of qualified immunity has been raised, we will review to determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed. Courts have referred to this second inquiry as asking whether the officer had "arguable" probable cause. Arguable probable cause

exists when "a reasonable police officer in the same circumstances and with the same knowledge . . . as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law.

Because I am convinced that material issues of fact remain as to whether Franckowiak had probable cause, qualified immunity must here be based, if at all, on a conclusion that a reasonable officer could have mistakenly believed that probable cause existed. Unfortunately for Franckowiak, the same material issues of fact that preclude a legal determination of probable cause at this stage similarly preclude a determination that a reasonable person in Franckowiak's position could have failed to ascertain that what he was doing was illegal. To name a few, there remains a dispute as to: (1) whether Braun was addressing Franckowiak in a loud or boisterous manner; (2) whether Braun disobeyed an alleged "step aside" order given by Franckowiak (which Franckowiak himself denies making); and (3) whether Braun's statements to Franckowiak had *any* negative effect on passersby in the vicinity (Braun says no crowd was gathering, and nobody was bothered, while other evidence suggests passersby were "upset"). Given that these material facts are in dispute, Defendant Franckowiak is *not* entitled to qualified immunity as a matter of law, for reasonable persons could disagree on whether a reasonable law enforcement officer in the same circumstances and with the same knowledge as Franckowiak could have reasonably believed the arrest was lawful.

I want to make it eminently clear that I do not condone the foolish actions of these two individuals—Braun and Currier—who hold themselves out as protectors of the ideals of our United States Constitution, for in my estimation these men are merely seeking notoriety, and are doing

so at the expense of their fellow citizens and the justice system. Indeed, their local community might be better served by their marching and performing in the annual circus parade than by their continuing their annual visits to the Milwaukee County Courthouse to advocate such a destructive practice as jury nullification. Nonetheless, Milwaukee County officials have—at least until now—*permitted these two men to pass out jury nullification fliers on Jury Rights day* (which is also a clear exercise of poor judgment), and so Braun's actions on September 5, 2000 (his passing out the literature, his taking Franckowiak's picture, his maintaining that he had permission to pass out fliers, and his refusal to leave the premises unless he was given a valid reason for doing so) could not be classified as unlawful or disruptive actions (at least if we are to assume, as we must at this stage, that these actions were done in neither a loud nor boisterous manner). Because Braun's actions fall short of supporting probable cause for arrest, I would reverse the district court's grant of summary judgment on Plaintiff's unlawful arrest claim.

A true Copy:

      Teste:

                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*